**In re Stuart R. ROSS, Debtor.**

**Bankruptcy No. 83 B 11757 (JG).**

United States Bankruptcy Court,
S.D. New York.

Aug. 22, 1986.

See also, Bkrtcy., 64 B.R. 829.

Barst, Mukamal & Babitt, by Stuart N. Bernstein, New York City, for original petitioners.

Barrett Smith Schapiro Simon & Armstrong, New York City, for Merrill Lynch Futures, Inc.

Rosenman Colin Freund Lewis & Cohen by Eugene A. Gaer, New York City, pro se.

Robson, Miller & Osserman, Cooper Cohen Singer Ecker & Shainswit, by Morton S. Robson, New York City, for Robson & Miller and WLW Funding Corp.

Fenwick, Stone, Davis & West by Jack David, New York City, Melincove, Kaufman, Weiner & Smouse, P.A. by Ransom J. Davis, Baltimore, Md., for Richard L. Vogel and Seneca Mining Corp.

Fox Glynn & Melamed, by John R. Horan, New York City, for Roger L. Deville.

Certilman Haft Lebow Balin Buckley & Kremer by Martin F. Brecker, Jeffrey W. Levitan, Law Offices of Stuart A. Jackson by Stuart A. Jackson, New York City, for debtor.

MEMORANDUM DECISION AND ORDER GRANTING MOTIONS TO INTERVENE AND DENYING MOTIONS TO DISMISS INVOLUNTARY PETITION AND TO WITHDRAW AS PETITIONING CREDITOR

PRUDENCE B. ABRAM, Bankruptcy Judge:

Despite seven days of trial, a significant change in the applicable law, an application

by one of the petitioning creditors for leave to withdraw, two motions for intervention, a motion for dismissal or abstention and resolution of a motion for summary judgment in a companion case adversely to two of the petitioning creditors,[1] the merits of this involuntary petition cannot yet be finally resolved. As this decision will make clear, the legal issues respecting involuntary petitions are of continuing complexity. What makes this case particularly difficult is the sheer magnitude of the non-bankruptcy litigation the debtor, Stuart Ross ("Ross" or "Debtor"), has engaged in with the seven petitioning creditors.[2] For the reasons which follow, this court has concluded that this debtor cannot create a bona fide dispute with respect to each of the petitioner's claims through mere litigiousness. This court can, and must, go below the surface of this sea of litigation to determine the issues raised by the involuntary petition.

The involuntary Chapter 7 petition was filed against Ross on December 8, 1983. The original petitioning creditors were Merrill Lynch Commodities, Inc. ("Merrill"); Rosenman, Colin, Freund, Lewis & Cohen, Esqs. ("Rosenman"); Robson & Miller, Esqs. (the "Robson Firm") and WLW Funding Corporation ("WLWFC") (collectively the "Original Petitioners"). The nature and amount of petitioners' claims were described in the petition as follows:

| Creditor | Nature | Amount |
| --- | --- | --- |
| Merrill | deficit balance in corporate commodities trading account used by debtor | $473,877.28 |
| | and guaranteed by debtor. | |
| Rosenman | unpaid attorneys' fees | $ 91,187.27 |
| Robson Firm | guarantee of corporate loan; conversion of notes pledged to the Robson Firm. | $305,000.00 $347,171.57 plus punitive damages |
| WLWFC | guarantee of corporate loan; conversion of notes pledged to WLWFC. | $220,000.00 $170,000.00 plus punitive damages |

The involuntary petition alleged that Ross was generally not paying his debts as they became due as indicated by the following:

a) Rosenman had obtained a judgment against the Debtor in the amount of $71,558.85, which amount remained unpaid except for $175.25 collected upon execution of the judgment;

b) the Debtor had made no payments on debts owed to the other petitioners; and

c) the Debtor had not paid various tax bills and two judgments as follows had been entered against him:

   1)  City of New York     $3,529
   2)  N.Y.S. Tax Commission  7,259.

Ross filed an answer to the petition on January 3, 1984. Ross denied the allegations of the petition as to the claims of the Original Petitioners except admitted that Rosenman held a claim against Ross not contingent as to liability for unpaid legal fees in the amount of $71,558.85. A denial

---

1. See *In re General American Communications Corp.*, 63 B.R. 534 (Bankr.S.D.N.Y.1986).

2. This is one of eight related cases in this district, six of which were filed before this case and one after. The five filing under voluntary Chapter 11 petitions filed by limited partnerships in which a Ross-related entity was the general partner. These cases are *In re 1979 Equidyne Properties, II* (83 B 10613) filed April 26, 1983; *In re 1981 Equidyne Properties, III* (83 B 10652) filed April 29, 1983, *In re 1980 Equidyne Properties, IV* (83 B 11030) filed July 12, 1983; *In re 1981 Equidyne Properties, II,* (83 B 11049) filed July 15, 1983; and *In re 1981 Equidyne Properties, I, a/k/a 1980 Equidyne Properties, III* (83 B 11191) filed August 16, 1983. The sixth case filed was the voluntary Chapter 11 petition filed by General American Communications Corp. ("GACC"), filed October 14, 1983, see footnote 1, *supra.* This involuntary against Ross was next, having been filed on December 8, 1983. Thereafter, an involuntary was filed against Equidyne Properties, Inc. on December 1, 1984 (84 B 11373). That petition has been dismissed. See the court's decision at 60 B.R. 245 (Bankr.S.D.N.Y.1986).

was made to the allegation that Ross was generally not paying his debts as they became due except Ross admitted that he had made no payments to the Original Petitioners except for the $175.25 collected by Rosenman on execution. Ross denied knowledge or information sufficient to form a belief as to the existence of the City of New York and N.Y.S. Tax Commission judgments.

Five affirmative defenses were asserted by Ross. The first defense was that the petition failed to state a claim upon which relief could be granted. The second defense asserted was that the claims of Merrill, the Robson Firm and WLWFC were contingent as to liability, disputed, unliquidated and subject to pending litigation and thus the requirements of Bankruptcy Code § 303(b)(1)[3] had not been met. The third defense was that Ross was not generally not paying his debts as such debts became due, that no custodian, receiver or agent had been appointed or authorized to take charge of any of Ross' property and that thus Code § 303(h) had not been satisfied. The fourth affirmative defense was that the litigation respecting liability on the Merrill, the Robson Firm and WLWFC claims, which were stated to be contingent, contested and unliquidated, was pending in other more appropriate forums and that in consequence the bankruptcy court should abstain from exercising any jurisdiction. The fifth and final defense was that

> "The petition herein was not filed in good faith but, rather, to harass and annoy the

alleged debtor and to frustrate his efforts to defend against the claims of petitioners Merrill Lynch Commodities, Robson & Miller and Wake L. Warthem."

By notice of motion dated February 23, 1984, Ross sought leave to file an amended answer. The first four defenses were identical to those asserted in the original answer. The fifth defense, however, was much enlarged and elaborated upon, with great stress being placed on the supposed bad faith, malice and lack of justification of the Robson Firm and WLWFC.[4] On the first day of trial, the court denied the motion to amend the answer without prejudice to renew the request at the end of the trial. Trial Transcript, 3/6/84 at 58. The fifth defense need not be reached if the involuntary petition is sustained and an order for relief entered.

Shortly after the involuntary petition was filed and before the trial commenced, the Original Petitioners filed a motion seeking the appointment of an interim trustee pursuant to Bankruptcy Code § 303(g) to take possession of Ross' property as well as for injunctive relief against the transfer of assets by Ross or any corporations, partnerships or other entities, including twenty-three named entities, owned or controlled directly by Ross or the named entities (the "Corporations"). The application alleged that there was a substantial likelihood that at trial the movants would be able to establish that "each of the corporate defendants is no more than the alter-ego of Ross and

---

**3.** Prior to the enactment of BAFJA and at the time this petition was filed, Code § 303(b) provided, in pertinent part:

> "An involuntary petition is commenced by the filing * * * of a petition * * *
> "(1) by three or more entities, each of which is * * * a holder of a claim against such person that is not contingent as to liability * * * if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims * * *."

**4.** Not satisfied, apparently, with the mere assertion of claims against the Original Petitioners in the form of a defense, Ross caused the commencement of an action in the Supreme Court of the State of New York, County of New York,

Index No. 29254/84, bearing the caption *General American Corp., et al. v. Merrill Lynch Commodities, Inc., et al.* (the "Damages Action") on or about December 18, 1984. The plaintiffs in the Damages Action, some twenty-seven or so entities owned or controlled by Ross, sued the Original Petitioners for compensatory damages of not less than $1,000,000 and punitive damages of not less than $3,000,000 per plaintiff on the grounds of *prima facie* tort and unlawful and intentional interference with prospective business relationships, *inter alia*, as a result of the Settlement Stipulation discussed *infra*. The Damages Action was removed to the Bankruptcy Court by the Defendants. A motion for summary judgment by the Original Petitioners has been made.

that they are all part of the massive scheme perpetrated by Ross to shield assets from creditors." On January 6, 1984, that motion was settled by entry into a stipulation (the "Settlement Stipulation") between Ross, the Corporations and the Original Petitioners which was so ordered by the court. The Settlement Stipulation provides that Ross and the Corporations are restrained from transferring funds other than in the ordinary course of business. Ross is permitted to draw an aggregate weekly salary of $5,000. Ross and the Corporations are to provide semi-monthly accountings of all receipts and disbursements and to make their books and records available for inspection. Ross and the Corporations cannot pay any debt or expense in excess of $10,000 without prior notice. Transfers between the entities and to third parties are restricted. In the summer of 1984, two motions were made relative to the Settlement Stipulation: Ross made a motion to vacate the Settlement Stipulation and the Original Petitioners made a motion to enforce its provisions or accountings. On February 27, 1985, this court denied the motion to vacate the Settlement Stipulation but found that a further hearing would be required before the contempt request could be determined.[5]

In March 1984, a trial on the involuntary petition began before Bankruptcy Judge John J. Galgay, to whom the case was then assigned. The trial ran for seven days in March and April 1984 and produced 900 pages of transcript and some 70 exhibits were offered. Unfortunately, Judge Galgay became ill in April 1984 and died in May 1984 before the trial could be resumed and completed. The principal witness at trial was Ross himself, who testified extensively on both direct and cross-examination.

■ After Judge Galgay's death, the case was reassigned. A trial *de novo* is generally required when continuation of a trial is to be conducted before another judge. See Rule 9028 of the Bankruptcy Rules of Procedure; *In re Schoenfield*, 608 F.2d 930 (2d Cir.1979); *In re Potter Instrument Company, Inc.*, 15 B.R. 202 (Bankr. E.D.N.Y.1981). The purpose of requiring a new trial is the importance of credibility assessments in evaluating the testimony. *Schoenfield, supra.* Mid-hearing resumption by a new judge is permissible only when unanimous party consent is given. See *Arrow-Hart, Inc. v. Phillip Carey Company*, 552 F.2d 711 (6th Cir.1977); *Bromberg v. Moul*, 275 F.2d 574 (2d Cir. 1960); *Wright & Miller, Federal Practice and Procedure*, § 2922 (1971). The unanimous consent of the parties was not given and this court therefore could not resume the trial midstream.

Before a new trial could commence and on July 6, 1984, Ross filed a motion to dismiss the involuntary petition on the grounds that the petition lacked a sufficient number of non-contingent petitioners. The motion sought alternative relief in the form of requesting that the court abstain from jurisdiction and dismiss the petition pursuant to Code § 305(a)(1).[6]

This motion intersected with the disruption of the bankruptcy court system due to congressional inaction to resolve the jurisdictional crisis which followed the decision of the United States Supreme Court in *Northern Pipeline Construction Co. v.*

---

5. In refusing to vacate the Settlement Stipulation, the court found that the stipulation embodied a reasonable subject matter in light of the prospective issues, that it was entered into freely in order to avoid the necessity of hearings which would raise many issues and that the stipulation contained a number of concessions in Ross' favor as well as imposing certain burdens on him. Further it was found that the stipulation did not markedly favor one side or the other nor that it was beyond the reach of a reasonable settlement in light of the possible outcome inasmuch as an interim trustee, if ap-

pointed, would have as a first and foremost duty undertaken to exercise control over the corporations.

6. Code § 305(a)(1) provides that

"The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension * * *."

*Marathon Pipe Line Co., et al.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). On July 10, 1984, Congress adopted the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"). In addition to the various jurisdictional provisions of BAFJA, certain substantive changes in the Bankruptcy Code were made, including important amendments to Code § 303, which governs involuntary cases. These amendments applied to then pending cases. BAFJA, Pub.L. No. 98–353, § 553(b), 98 Stat. 333, 392 (see 9 Bankr.Serv.L.Ed.Supp. at 66). See also *In re Stroop*, 51 B.R. 210, 13 B.C.D. 319 (Bankr.D.Colo.1985). The amendments included a requirement that a petitioner's claim could not be the subject of a "bona fide dispute", in addition to the existing requirement that the claim not be contingent.

By notice of motion dated August 13, 1984, Ross amended his motion to add to his abstention request an offer to deposit in escrow cash, a second mortgage and an account receivable to be paid to the petitioning creditors in the event of final judgments in their favor on the claims. Ross submitted that by collateralizing the unpaid petitioning creditors that he assured payment of the claims yet, at the same time, preserved his right to continue to pursue his defenses and counterclaims. The Original Petitioners opposed the offer on the grounds that the non-cash security was unacceptable in quality and that the offer was insufficient in light of substantial federal tax liens. Further, it was stated that the offer was little different than one previously rejected by the Original Petitioners.

Subsequently, the parties briefed the issues raised by the BAFJA amendments to Code § 303. Thereafter, in February 1985, two separate motions were made for leave to intervene as petitioners. Ross opposed both of the motions and alleged that neither motion should be granted as the intervenors' claims were the subject of a bona fide dispute.

By motion dated November 5, 1985, Merrill sought leave to withdraw as a petition-

er. Merrill's motion states that it has agreed on a settlement of its litigation with Ross. The stipulation of settlement provides that Ross and a co-defendant will each deliver confessions of judgment for $450,000 plus interest and that Merrill will be entitled to enter judgments based on the confessions if Ross and/or the co-defendant do not pay $225,000 in accordance with specified terms. In the stipulation Ross represents that the funds used to make the agreed payment will be from entities that are not in bankruptcy and are not insolvent. Merrill agreed to apply to this court for leave to withdraw as a petitioning creditor. Ross also agreed to drop Merrill as a defendant in the Damages Action.

Ross, of course, does not oppose Merrill's withdrawal as a petitioner. The Robson Firm and WLWFC have opposed the motion. They urge that the motion must be denied if Merrill's withdrawal would result in defeating the petition. In addition, they urge that as a result of the Settlement Stipulation, Ross' representation of the source of the payments to Merrill is insufficient. Affidavit of Kenneth N. Miller in Opposition to Motion to Withdraw as Petitioning Creditors Sworn to December 6, 1985 at ¶¶ 3 and 9.

For the reasons which follow, the court finds that Ross' motion to dismiss the involuntary petition on the grounds of insufficient eligible petitioners should be denied. Merrill's motion for leave to withdraw as petitioner is also denied. The motions for intervention as petitioning creditors are granted. Ross' motion for abstention or dismissal under Code § 305 is also denied.

## DISCUSSION

Bankruptcy Code § 303(b)(1) provides that an involuntary case may be commenced by the filing of a petition

"by three or more entities, each of which is * * * a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute * * * if such claims aggregate at least $5,000 more than the value of any lien on

property of the debtor securing such claims * * *."

An order for relief may be entered only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts * * * are the subject of a bona fide dispute * * *." Code § 303(h)(1).

The BAFJA amendment added the key phrase "the subject of a bona fide dispute" to both Code § 303(b)(1) and (h)(1).

Little history to the BAFJA amendment to Code § 303 exists as the amendment was not among the much debated proposals that preceded the enactment of BAFJA. In proposing the amendment, Senator Max Baccus of Montana stated:

"The problem can be explained simply. Some courts have interpreted Section 303's language on a debtor's general failure to pay debts as allowing the filing of involuntary petitions and the granting of involuntary relief even when the debtor's reason for not paying is a legitimate and good faith dispute over his or her liability. This interpretation allows creditors to use the Bankruptcy Code as a club against debtors who have bona fide questions about their liability but who would rather pay up than suffer the stigma of involuntary bankruptcy proceedings. * *

"I believe this amendment although a simply [sic] one is necessary to protect the rights of debtors and to prevent misuse of the bankruptcy system as a tool of coercion * * *." S. 7618, 98th Cong. 2d Sess., June 19, 1984.

**7.** The *All Media* decision continues to provide a sound definition of the term "contingent".

"[C]laims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim accrued." 5 B.R. 126 at 133.

The court further opined in *All Media*

There is no definition of "bona fide dispute" in the Code. Nor does reference to the pre-BAFJA cases supply any ready definition. See, e.g., *In re B.D. International Discount Corp.*, 701 F.2d 1071 (2d Cir. 1983), *cert. den.* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110; *In re Covey*, 650 F.2d 877 (7th Cir.1981); and *In re All Media Properties, Inc.*, 5 B.R. 126 (Bankr.S.D. Tex.1980), *aff'd* 646 F.2d 193 (5th Cir.1981).

Much of the pre-BAFJA dispute in this case turned on whether the Original Petitioners' claims were contingent. Prior to the BAFJA amendment, a number of courts attempted to limit the standing of a petitioning creditor whose claim was disputed by the debtor by defining the claim as contingent. The BAFJA amendment removes any justification for strained interpretations of the term contingent[7] and the court in this case may therefore turn its focus to the meaning of the "bona fide dispute" phrase.

This court has already stated that the simplicity of the "bona fide dispute" language is deceptive, see *In re Drexler*, 56 B.R. 960, 966 (Bankr.S.D.N.Y.1986), and substantial interpretative problems are presented. One court dealing with the issue has held that if the defense of the alleged debtor to the claim of the petitioning creditor raises material issues of fact or law so that

"a summary judgment could not be rendered as a matter of law in favor of the creditor on a trial of the claim, the claim is subject to a bona fide dispute."

*In re Stroop*, 51 B.R. 210, 212 (Bankr.D. Colo.1985).[8] Another court grappling with the issue has held:

"[T]he court believes that it is better to determine whether the holder of the claim has shown that liability on the debt existed * * *. If there is a bona fide dispute of either fact or law then the holder would not be disqualified from being a petitioning creditor since he would be a holder of a disputed claim, but not one that is contingent as to liability within the definition fashioned above." 5 B.R. at 135. See and compare *In re Covey*, 650 F.2d 877 (7th Cir.1981).

**8.** In a pre-BAFJA decision, the Second Circuit stated a similar proposition:

"A bona fide dispute is a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side."

*In re Johnston Hawks, Ltd.,* 49 B.R. 823, 830 (Bankr.D.Ha.1985).

This court has held that

"[a] general answer may be given that a claim based upon an unstayed judgment as to which an appeal has been taken by the debtor is not the subject of a bona fide dispute. * * *

"It would be contrary to the basic principles respecting, and would effect a radical alteration of, the long-standing enforceability of unstayed final judgments to hold that the pendency of the debtor's appeal created a 'bona fide dispute' within the meaning of Code § 303."

*In re Drexler, supra,* 56 B.R. at 967.

The final judgment rule established by this court in the *Drexler* case is applicable in its pure form to only one of the petitioners in this case, Rosenman. Therefore, it is necessary for this court to adopt a broader *ratio decidendi* which will enable it to apply the bona fide dispute standard to the wide variety of litigation postures encountered in this case, hopefully with some logical consistency and predictability. The Second Circuit has wisely suggested that until case law has had the benefit of development over a period of time the issues raised by an involuntary petition should be determined only to the extent required by the facts of the case. See *In re B.D. Interna-*

*tional Discount Corp., supra,* 701 F.2d at 1077.

A basic approach to development of a general thesis about the meaning of bona fide dispute is to start with the definitions of the key words. The term "claim" is one defined by the Code. Code § 101(4) provides:

" 'Claim' means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured * * * "

Of the types of claims specifically enunciated in Code § 101(4), only the holder of a contingent claim is specifically excluded from being a petitioning creditor. See Bankruptcy Code § 303(b)(1).

■ Definitions must be given as well to the terms "dispute" and "bona fide." The terms are not defined in the Code. A "dispute" can be defined as

"A conflict or controversy; a conflict of claims or rights; an assertion of a right, claim, or demand on one side, met by contrary claims or allegations on the other." *Black's Law Dictionary* (Rev. 4th Ed.)

This is a useful definition of dispute providing counterclaims made by the Debtor are

---

"Still we have difficulty in believing that Congress intended that a debtor should be found to be generally not paying its debts as they become due under § 303(h)(1) or that a claim qualifies under § 303(b), when the claim is subject to serious dispute. As said in *In re Nar-Jor Enterprises Corp.,* 6 B.R. 584, 586 (Bankr.S.D.Fla.1980), the bankruptcy courts were 'not designed or intended to be the forum for trying isolated disputed claims.' But here, after having been afforded the opportunity, B.D.I. failed to demonstrate to the bankruptcy court what ground it had for disputing Chase's claim. In order to qualify a claim as a basis for seeking involuntary bankruptcy, a claimant need not make out a case warranting summary judgment although in fact Chase came close to this. It is sufficient to establish, as Chase did here that there are good grounds for the claim and that no defenses have been asserted in substantiable form. Whether less may suffice we need not decide." *In re B.D. International Discount Corp.,* 701 F.2d at 1076–77.

960

excluded.[9] Finally, the term "bona fide" must be defined. It means

"In or with good faith; honestly, openly, and sincerely; without deceit or fraud. * * * Truly; actually; without simulation or pretense. Innocently; in the attitude of trust and confidence; without notice of fraud * * * real, actual, genuine, and not feigned * * *." *Black's Law Dictionary* (Rev. 4th Ed.)

Accord, *Webster's New International Dictionary* (2d Ed.). Combining these definitions suggests that the phrase "bona fide dispute" can be defined as "honest conflict" or "good faith controversy."

This definitional exercise results in a general definition not notably different than the test found in *In re Johnson Hawks, Ltd., supra.* Unfortunately, the definition by itself is too general to be of much assistance in resolving actual cases. First, it places too much emphasis on an individual judge's subjective analysis. It is thus difficult, if not impossible, to apply consistently and affords little predictability of result. Secondly, it would encourage debtors to engage in pre-involuntary litigation. The facts of this case have caused this court to conclude that it must reject any idea that the mere pendency of a lawsuit relative to a petitioner's claim creates a bona fide dispute. Ross' capacity for litigation makes it apparent that adoption of such a *per se* rule would allow any debtor to avoid or defeat an involuntary petition simply through engaging in litigation.[10] Thirdly, it suggests that the subjective intent of the debtor in opposing a claim, or that of a creditor in pursuing it, is an important consideration. Finally, and possibly most importantly, it would make it difficult, if not impossible, to ever enter an order for relief in a contested involuntary because the definition appears to set such a low threshold standard for bona fide dispute that virtually any motivated debtor could find a way to meet it. Indeed, the litigation which would ensue would likely be highly reminiscent of that surrounding the "colorable claim" disputes under the former summary-plenary jurisdiction dichotomy. See, e.g., *Cline v. Kaplan,* 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944).

■ In spite of these objections, this definition must be the starting point for development of more specific rules applicable to common fact patterns. See, e.g., *In re Drexler, supra,* with its establishment of a final, unstayed judgment general rule. The fact patterns in this case involve prepetition litigation.[11] The first task of the bankruptcy court must be to review the pre-petition litigation to ascertain its procedural history and filing date posture and to determine the contentions made in it by the parties. This objective review and analysis may be accomplished readily. Particular attention should be paid to procedural landmarks. Once its review is complete, the bankruptcy court is in a position to determine whether the posture of the pre-petition litigation favors or opposes a determination that a bona fide dispute exists and whether the debtor's legal position in that litigation has any genuine and objectively determinable legal merits. This analysis fits in well with the reasons offered in Congress for the addition of the bona fide dispute language to Code § 303, i.e., that the filing of an involuntary petition should

---

9. This court held in *Drexler*

"[A]s a general rule the debtor's assertion of counterclaims, even if of substance, does not render the petitioner's claim the subject of a bona fide dispute. Counterclaims serve, if established, to work a diminution or setoff of the claim of the petitioning creditors, either as part of the Code § 303(b)(1) analysis of the amount of the petitioner's claim or as part of the Code § 303(h)(1) analysis of generally not paying, in which the amount of a petitioner's claim may be relevant. The BAFJA amend-

ment has not altered this established treatment of counterclaims." 56 B.R. 969.

10. The sanctions found in Fed.R.Civ.Pro. 11 and Bankruptcy Rule 9011 impose some limitations on a debtor's ability to engage in "defensive" litigation, at least in the federal courts. However, these existing limitations are insufficient to warrant adoption of a *per se* rule.

11. The term "pre-petition litigation" refers to litigation pending in a non-bankruptcy forum at the time the involuntary petition was filed.

not be a litigation tactic to force payment of a debt legitimately disputed.

■ The bankruptcy court's assessment of the legal merits of the pre-petition litigation cannot be freewheeling and is constrained by the substantive and procedural posture of the litigation at the time the involuntary petition was filed because appropriate effect must be given to any rulings already made in the litigation. It is of little moment whether the bankruptcy court would have reached the same result as the non-bankruptcy forum since the bankruptcy court is not free to act as a kind of super-appellate court to correct what it may see as the errors or omissions of other courts. See *In re Mastercraft Record Plating, Inc.*, 39 B.R. 654, 658 (D.C.S.D.N.Y.1984) ("There is no authority * * * sanctioning a bankruptcy court's consideration *de novo* of an issue which has been presented to or decided by a state court having jurisdiction over the dispute."), *reversing* 32 B.R. 106 (Bankr.S.D. N.Y.1983).

The question arises as to whether and how the *Stroop* summary judgment test can be used when a claim is the subject of pre-petition litigation. What if the pre-petition litigation has just begun and discovery has not yet commenced? What if a summary judgment motion has been made in that litigation and decided adversely to the claimant? Use of the summary judgment test by the bankruptcy court in such cases might encourage claimants dissatisfied with the progress of the pre-petition litigation to join in an involuntary petition to circumvent the litigation. Testimony offered by the petitioners about their reasons for filing the petition will assist the bankruptcy court in its assessment. Parenthetically, the court notes that it should not be necessary for the petitioners to call the debtor to establish their *prima facie* case as the debtor's sincerity or lack of it is not at issue since the debtor's pure heart would not allow him to prevail in the pre-petition litigation if his position were without objective legal or factual merit nor would the debtor's ill will or spite in standing on a legal technicality generally preclude the debtor from prevailing in that litigation. Of course, the debtor as part of the defense may wish to testify for the purpose of filling in any factual gaps, clearing up ambiguities, or offering explanations of the debtor's pre-petition conduct or acts, words and deeds relative to one or more of the petitioners' claims.

■ The usefulness of the *Stroop* summary judgment test appears to be limited to analyzing pre-petition litigation still in its early stages. It is debatable whether a heavier burden should be placed on the petitioner involved in pre-petition litigation with the debtor than the one who is not since the bankruptcy court should generally be a forum of last resort. Involuntary bankruptcy can be viewed as the ultimate prejudgment attachment since it freezes the debtor's assets for the benefit of all creditors. The Second Circuit in its pre-BAFJA decision, *In re B.D. International,* has suggested that something less than the certainty required for summary judgment might be sufficient. See Footnote 8. This makes sense when it is considered that the petitioner may join in or file the involuntary petition because of legitimate concern about the debtor's solvency and out of a desire to see the debtor's assets preserved until the litigation is resolved rather than out of an attempt to achieve tactical advantage. Indeed there is nothing in Code § 303 which mandates that a petitioner allege or prove that its claim is not being paid, only that the claim is not contingent or the subject of a bona fide dispute.

■ Undue weight cannot be placed on the nature of the claims held by the petitioners as the debtor's true protection against an improvident involuntary petition lies in the independent requirement of Code § 303(h) that it be established that the debtor is generally not paying its debts as they become due. In its final analysis before entering an order for relief, the court must test its result by balancing the interests of the creditors against those of the debtor before entering an order for relief

on an involuntary petition if the debtor disputes the petitioners' claims.

"As a means of determining whether the application of general rules to the facts in a given case has reached a result on an unduly formalistic basis without regard to broader policy considerations evidenced in the sparse legislative history to the BAFJA amendment. * * *

"At some point in the downward spiral of a business enterprise, the creditors are entitled to call a halt."

*In re Drexler*, 56 B.R. 972.

Now that the general principles have been set out, the facts must be reviewed and a conclusion reached as to the eligibility of each petitioner.

## ROSENMAN

The only one of the many petitioners that Ross concedes is an eligible petitioning creditor is Rosenman. Rosenman holds a final, non-appealable judgment against Ross in the amount of $71,558.85 entered on March 11, 1982 in the Supreme Court of the State of New York, County of New York, Index No. 6817–1981. The judgment includes interest from October 29, 1980. Ross was the only defendant in the action. Rosenman may therefore be counted as one of the required three petitioners.

## MERRILL

■ The next petitioner whose claim will be considered is Merrill, the petitioner seeking leave to withdraw as a petitioner. If Merrill is an eligible petitioning creditor, Merrill cannot withdraw if its withdrawal would result in the defeat of the involuntary petition. See *In re Claxton*, 21 B.R. 905 (Bankr.E.D.Va.1982); *Sheehan & Egan, Inc. v. North Eastern Shoe Co.*, 47 F.2d 487 (1st Cir.1931); and 2 Collier on Bankruptcy (15th Ed.1986), ¶ 303.37[3].

Merrill asserts a claim against Ross of $473,877.28 based on Ross' purported liability for losses incurred as a result of commodities trading in a margin account in the name of Esqro Holdings Corporation ("Esqro"). Apparently Merrill had institut-ed an action against Ross and Esqro that was pending at the time the involuntary petition was filed. However, neither side has chosen to place any information before the court about the litigation or its status. The court therefore assumes that at the time the involuntary petition was filed the procedural posture of the litigation was irrelevant. In that instance, it is appropriate to determine whether the claim passes the *Stroop* summary judgment test.

Just before the trial commenced on the involuntary petition, Ross encapsulated his position on Merrill's claim as follows:

"9. [Merrill] * * * misadvised Esqro Holdings Corp. ("Esqro"), a corporation through which Ross conducts business, concerning [Merrill's] * * * purchase and sale of commodity contracts for Esqro's account. Throughout the course of doing business, Esqro paid hundreds of thousands of dollars in fees and never defaulted under margin calls amounting to additional hundreds of thousands of dollars. Moreover, after doing business for years, [Merrill] * * * began acting with knowledge of or gross indifference to the fact that the subject transactions were becoming grossly disproportionate to the size, nature and investment objectives of the Esqro account. Finally, [Merrill] * * * convinced Esqro to change its account to a discretionary account, with [Merrill] * * * designated as the agent and attorney-in-fact for the purpose of buying and selling commodities contracts. [Merrill's] * * * subsequent churning and mismanagement of the Esqro account created a large deficit in said account.

"10. It is this deficit, the responsibility for which is disputed, that forms the basis for the claim that [Merrill] * * * asserts in support of the Petition. [Merrill] * * * claims that Ross guaranteed Esqro's account. Not only does Ross dispute the existence of a guaranty, but any such liability of Ross is contingent upon a determination that Esqro is liable to [Merrill] * * *.

"11. The [Merrill] * * * claim against Ross and the Ross claims for damages

against [Merrill] * * * are pending in actions in the Supreme Court of the State of New York, New York County." Application of Stuart Ross dated February 23, 1984 in Support of Motion for Immediate Trial Et Al.

Ross thus asserted both defenses to the Merrill claim as well as counterclaims.

■ The defenses raised by Ross are, based on Ross' testimony at trial, legally and factually insufficient to preclude summary judgment in favor of Merrill. Ross testified at the never concluded trial that the Esqro account came to a screeching halt after an overnight gold price drop in early September 1982. Ross testified at some length respecting his several conversations with the Merrill broker during the course of that September evening about gold transactions in the Esqro account. Ross testified that he agreed to the transaction because he thought gold prices were going to rise. Ross concluded his testimony:

"Well, P.S., to make a long story short, it [i.e. the rise in gold prices] never happened, gold dropped to $35 or $40, I took a loss on a hundred contracts of sixty points, which is $600,000, which is the amount of the debit in the account, and that's when the account came to a screeching halt." Trial Transcript, 4/2/84 at 810.

It is apparent from Ross' testimony at trial that he personally authorized the trades which resulted in the loss and thus the purported defense that the account was a discretionary one is irrelevant.

■ Previously and on April 30, 1982, Ross had signed a letter addressed to Merrill in which Ross said that Merrill could treat the Esqro account as if it were in his own name. The letter in essence says that the named account holder is a mere nominee for Ross, the true owner. That letter without more is sufficient to impose direct liability on Ross for the Esqro account and to warrant judgment in Merrill's favor.

Merrill has also asserted another basis for imposing liability on Ross for the Esqro account. Two years before the Esqro loss,

Ross had executed and delivered an agreement dated June 2, 1980 in which he guaranteed payment of, among other things, "any losses which you may sustain upon said customer's account by reason of insufficient margin or otherwise" in consideration of Merrill Lynch Pierce Fenner & Smith, Inc. ("MLPF & S") acting as brokers for Esqro. The guaranty agreement states that it is a continuing guaranty for any present or future accounts and that it will continue in effect until revoked by Ross. Ross never gave notice of revocation although after the guaranty was given Ross did close the accounts and cease trading through MLPF & S for a period of time. The loss in question arose after he had resumed trading through Merrill.

■ The New York Court of Appeals held the week prior to the commencement of the involuntary petition that a lapse in time does not affect a continuing guarantee, the guarantor having the key to its termination by giving notice.

"Appellant's final argument is that it would be inequitable to enforce the guarantees. But appellants at all times have had the power to extinguish any perceived inequity. They could simply have served a written termination notice upon respondent. Their failure to do so cannot give rise to an equitable claim." *Chemical Bank v. Sepler,* 60 N.Y.2d 289, 294–95, 469 N.Y.S.2d 609, 457 N.E.2d 714 (1983).

Compare *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) (Summary judgment granted in favor of banks holding guarantees because the substance of the defendants' guarantee foreclosed their reliance on the claim that they were fraudulently induced to sign the guarantee by the banks' oral promise of an additional line of credit.) This guaranty would therefore also impose liability on Ross for the Esqro account if it were shown that Merrill is an assign, or successor, by merger, consolidation or otherwise to MLPF & S in whose favor the guaranty runs.

The court must still treat briefly with Ross' counterclaims consisting of allegations about the mishandling of his accounts by Merrill and MLPF & S over a period of years. Although Ross has admitted that he closed his accounts at one point because of what he thought was poor advice, he did not chose to assert any claims about the accounts until Merrill sought to recover for the clearly authorized September 1982 trading loss.

■■■■■■■ Counterclaims do not create a bona fide dispute and the court may reject any counterclaim that cannot be determined without unduly delaying the decision upon the petition. See *In re Drexler, supra*, 56 B.R. 969 and Footnote 8. In making a determination to preclude consideration of a counterclaim, a court should consider whether any undue unfairness will result. Here the court finds no unfairness in precluding consideration of the counterclaims. Merrill's claim is for a sum certain based on Ross' authorized trading on specific dates resulting in losses in gold futures. This definiteness is countered by vague and belated assertions that Ross' trading losses during prior periods were somehow caused by Merrill, rather than by his own bad judgment, and that he is entitled to offset those prior losses against the current one.

Thus, Merrill joins Rosenman as an eligible petitioner.

## THE ROBSON FIRM AND WLWFC

The claims of the Robson Firm and WLWFC, the last of the Original Petitioners, are related to a series of transactions between these petitioners and GACC, see Footnote 2, a corporation owned by Ross. GACC filed a Chapter 11 petition on October 14, 1983. By invoking the automatic stay, GACC frustrated the efforts of the Robson Firm and WLWFC to enforce an order of attachment obtained as a provisional remedy in an on-going and highly contentious state court suit (the "State Court Action") they had commenced in June 1983 against GACC and Ross. In addition, GACC sought and obtained a stay from the bankruptcy court of a pending examination of Ross on the grounds that his services were essential to a successful reorganization and that it would be prejudicial to GACC's reorganization attempt for Ross to take time away from the operation of GACC to defend the State Court Action.

In the State Court Action, the Robson Firm and WLWFC sought to recover on four secured loans they had made to GACC. They alleged that not only had GACC failed to repay the loans at maturity but Ross had converted the collateral. GACC and Ross raised as a defense that the interest on the loans exceeded the criminal usury limit of 25% and the loans were therefore unenforceable.

The Robson Firm and WLWFC filed proofs of claim in the GACC case and sought summary judgment in their favor after GACC objected to the claims. By memorandum decision and order dated July 30, 1986, this court denied the Claimants' motion for summary judgment and granted summary judgment in favor of GACC as the court found that the loans were unenforceable since the interest rate exceeded the criminal usury limit. The court also held that no claim against GACC for conversion of the collateral existed because the Robson Firm and WLWFC did not have a superior claim to the collateral in light of the unenforceability of the loans. Familiarity with that decision will be presumed. See Footnote 1.

■■■■ The claims asserted by the Robson Firm and WLWFC in this case against Ross are variants of their claims against GACC. Ross is alleged to have guaranteed the four loans and to have converted the collateral. The claims against GACC having failed, the claims against Ross must also fail.

That being said, however, does not necessarily resolve the question of whether the Robson Firm and WLWFC were eligible to be petitioners either at the time the involuntary petition was filed or after the BAFJA amendments. It is conceptually possible that the claim of a person deemed an

eligible petitioning creditor will ultimately be disallowed since the inability to grant summary judgment in the petitioner's favor is not necessarily fatal to the petitioner's standing. However, this court finds it unnecessary to consider the eligibility of the Robson Firm and WLWFC as petitioners as the validity of the petition does not depend on their standing.

## VOGEL

Having reviewed all of the Original Petitioners' claims, the court will now turn to those of the intervening petitioners. Richard L. Vogel ("Vogel") and Seneca Mining Corporation ("Seneca") filed a notice of joinder in the involuntary petition on February 4, 1985. On the date of the filing of the involuntary petition, December 8, 1983, Vogel and Seneca held a judgment of liability against Ross obtained in an action in the United States District Court for the District of Maryland (the "District Court"), Civil Action No. 81–1194 (the "Vogel Maryland Action"). The District Court had also concluded a three-day inquest on damages on September 28, 1983. However, the District Court still had the damage issue under advisement at the time the involuntary petition was filed and no final judgment had been entered at that time. Ross failed to advise the District Court, Vogel or Seneca of the commencement of this involuntary petition and concommitant automatic stay provided by Bankruptcy Code § 362.

About eleven months after the involuntary petition was filed and on or about November 6, 1984, the District Court issued a 24–page decision fixing the amount of the damage award. Judgment in conformity with the opinion was entered on November 9, 1984. Seneca was awarded judgment in its favor in the amount of $508,884.90, including interest; judgment was awarded in favor of Vogel, in the amount of $188,400.98, including interest; and a non-overlapping judgment in favor of Seneca and Vogel jointly, in the amount of

$514,837.23 was also awarded. The judgment imposed joint and several liability on Ross, Joel I. Beeler ("Beeler") and Eastern Mining Systems, Inc. ("Eastern"), a corporation of which Ross was the president.

On or about November 19, 1984, Ross moved in the district court to vacate the judgment or for a new trial pursuant [12] on the grounds that subsequent to the entry of the judgment he became aware of evidence, not available at the time of the damages trial which indicated that Vogel had misrepresented the damages suffered by Vogel and Seneca and that

"As a result of the evidence of the perjured testimony of R.L. Vogel, it appears that a serious injustice may have been occasioned upon the defendants, and that the defendants should be relieved of the judgment entered against them herein."

The grounds for the motion were set forth in affidavits from W. Randolph Wheeler ("Wheeler") and Andrew A. Levy ("Levy"), who had at one time been co-defendants. The five-page affidavit of Wheeler took issue with various conclusions of the District Court on which it had predicated its damage findings as to the value of various assets and the nature and amount of various liabilities involved in the disputed transaction.

Thereafter by motion filed in the district court on or about December 17, 1984, Ross for the first time advised the District Court, Vogel and Seneca of the pending involuntary bankruptcy case and sought to vacate the judgment as a nullity on the grounds that it had been entered in violation of the automatic stay and to stay the continuation of the Vogel Maryland Action against Ross because of the automatic stay.

Thereafter, Vogel and Seneca moved in this court for a modification of the automatic stay *nunc pro tunc* to permit rendition of the District Court's decision and entry of the judgment. Ross opposed the requested vacation of the stay because,

---

**12.** In addition to local Maryland counsel, the motion was signed by Stuart A. Jackson ("Jackson"), Esq., who, with others, has represented

Ross in connection with the involuntary case since its inception.

among other reasons, of his motion to vacate the judgment and for a new trial. This court by order dated March 12, 1985 vacated the automatic stay to permit entry of the decision and judgment. In addition, continued prosecution of the pending motions before the District Court and any appeals was authorized.

The Vogel Maryland Action had been instituted by Vogel and Seneca over two years before the involuntary petition was filed and on or about May 8, 1981 by the filing of a three-count, seventeen-page complaint against Ross, Beeler (who was also named as a defendant in the DeVille Action discussed *infra*), Eastern and Buckeye Petroleum Company ("Buckeye").[13] Vogel and Seneca settled the action against Levy, Wheeler, who are or were officers of Buckeye, and Buckeye before the judgments in issue here were entered. The complaint alleged in detail actions of Ross, Beeler and Eastern, as well as the other defendants, which were purported to have enabled Ross, Beeler and Eastern to take over the operations, assets and holdings of Bessemer Iron and Coal Company ("Bessemer"), Seneca and Westernport Minerals Company ("Westernport") without paying adequate consideration to Vogel. Vogel and Seneca sought to compel specific performance by the various defendants of their obligations under the oral contract for the purchase of the assets of Seneca, Bessemer and Westernport and the assumption of the outstanding liabilities of the three companies. In addition, Vogel and Seneca sought indemnity for any liability they incurred to certain named persons. Compensatory damages of $3,000,000 were sought on each of Counts One and Two and $1,500,000 on Count Three. The complaint was thereafter amended, enlarging certain allegations but not altering its essential charac-

ter. Apparently the defendants, including Ross, filed an answer, although no copy of it has been supplied to this court.

The District Court's judgment of liability was entered on June 22, 1983 almost six months before the involuntary petition was filed. The judgment of liability was entered as a result of Ross' continued disregard of district court orders. Prior to conducting the damages trial, the district court had considered and denied Ross' motion to reconsider and vacate the judgment. Ross' attorney attended the September 1983 trial on damages and cross-examined witnesses but no one testified on behalf of Ross or the other defendants. In addition, it appears that Ross' attorney had participated in a deposition of Vogel taken on or about September 20, 1983, a few days before the damage trial stated. Subsequent to the damages trial, Ross, as well as the plaintiffs filed memorandum and proposed findings of fact and conclusions of law.

■■■ On the date the involuntary petition was filed, Vogel and Seneca were the holders of claims against Ross which were not contingent as to liability as a result of the June 22, 1983 judgment of liability, although their claims were then unliquidated in amount. There is no requirement that a petitioner's claim be liquidated in amount.[14] See generally, *Frederic L. Grant Shoe Company v. W.M. Laird Company*, 212 U.S. 445, 29 S.Ct. 332, 53 L.Ed. 591 (1909). Liability was finally assessed by the district court a number of months prior to the time this involuntary case was commenced. There was nothing tentative or uncertain about the finding of liability. It was evident that a judgment in favor of Vogel and Seneca for some amount was inevitable as Ross was not free to relitigate the liability issue at the

---

**13.** Although not material to the present case, the court notes that Buckeye is presently the debtor in a Chapter 11 case pending before this court that was commenced by the filing of an involuntary petition on or about December 1983, by a creditor bank of Buckeye.

**14.** If the petitioner's claim is unliquidated, it is possible a petitioner's claim should be dis-

regarded in considering the generally not paying issue under Code § 303(h)(1). The petitioner with an unliquidated debt may not be in a position to complain of its nonpayment, yet by the other side of the same coin, the debtor cannot complain if the petition can be sustained because he is generally not paying his other debts.

damages hearing. See *Transworld Airways v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971) ("[A] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability."), *rev.* on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), *reh. den.* 410 U.S. 975, 93 S.Ct. 1434, 35 L.Ed.2d 707 (1973).

█ Ross' disagreement with the judgment of liability and the rulings of the District Court does not create a bona fide dispute as to the claims of Seneca and Vogel. The procedural posture is a variant of that in *Drexler* in which this court found that a claim based on technically non-final judgments that were the subject of an appeal was not the subject of a bona fide dispute. The pre-involuntary entry of a judgment of liability, while not creating a final judgment [15], is a giant step towards entry of a final judgment and a clear signpost of the debtor's exposure to the Claimant which this court is not free to ignore. Moreover, here the matter, including the damages issue, had been completely litigated before the involuntary petition intervened and the timing of Vogel's and Seneca's joinder as petitioners precludes any suggestion that the joinder was a mere litigation tactic.

The district court's decision renders it unnecessary for this court to estimate the amount of the claims of Vogel and Seneca as they have now been fixed by the District Court. It is unnecessary and inappropriate for this court to engage in speculation over the possible outcome of Ross' pending motion to vacate the judgment and for a new trial.

█ Vogel and Seneca are eligible petitioners. They count as two petitioners since each holds a separate, non-overlapping judgment in addition to the joint judgment.

### DEVILLE

The final petitioning creditor is Roger L. DeVille ("DeVille"), who filed a notice of joinder in the involuntary petition on February 21, 1985. It appears that on the date the involuntary petition was filed, DeVille held two unstayed judgments obtained October 14, 1983 and November 21, 1983 aggregating $956,000 running in his favor against Ross and a number of others.

DeVille had commenced the action which led to the judgments in the Court of Common Pleas, Stark County, Ohio, Case No. 82–1550, on October 19, 1982 against Equidyne Extractive Industries, Inc. ("Equidyne"), Equidyne Corporation ("Corporation"), Equidyne 1980 Petro/Coal Program I ("Program"), Equidyne 1980 Coal Venture I ("Coal Venture"), Equidyne 1980 Gas & Oil Association I ("Oil and Gas Partnership") (collectively the "Equidyne Entities"), Beeler, Ross, Robert H. Liebmann, McCarthy & Associates, Inc. ("McCarthy"), Names Unknown, Directors of Equidyne Extractive Industries, Inc., and Names Unknown, Directors of Equidyne Corporation (the "DeVille Ohio Action"). The complaint, which contains six counts, alleges that on or about November 30, 1980, DeVille purchased for an aggregate of $390,740.74, comprised of $100,000 in cash and the balance in notes, a security consisting of one unit (the "Security") in Equidyne Extractive Industries 1980 Petro/Coal Program I. Purchase of the Security is alleged to have entitled DeVille to participate as a limited partner in an oil and gas development partnership and as a joint venturer in a coal mining joint venture. Count One stated that the Security was not registered with the Ohio Division of Securities and that the sale of the Security was in violation of Chapter 1707 of the Ohio Revised Code. DeVille tendered the Security to the defendants and sought return of the amounts paid, the notes given and release of any obligations because of the unlawful sale of the Security. Relief under this count was sought against Ross as an officer, agent and director of Equidyne, who

---

**15.** Fed.R.Civ.Pro. 56(c) provides:

"A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damage."

participated and aided in making the sale of the Security to DeVille.

Count Two alleged that it had been falsely represented to DeVille that Equidyne would diligently undertake to develop the oil and gas properties and coal properties which were the subject of the investment represented by the Security. It was stated that at the time the complaint was filed twenty-two months had passed and that development of the properties had yet to commence. Count Three alleged a deliberate, bad faith refusal by Equidyne to provide periodic reports to DeVille and that Equidyne was thereby engaging in willful, wanton and fraudulent misconduct. Count Four sought appointment of a receiver to take charge of Equidyne, Program, Oil and Gas Partnership and Coal Venture. Count Five alleged that McCarthy had acted as a dealer in the sale of the Security to DeVille without being licensed to do so by the Ohio Division of Securities. DeVille sought recovery from McCarthy of the amount of the compensation paid to McCarthy by the Program. Count Six alleged that the actions of Equidyne, the Corporation, the Program, Beeler, Ross and Liebmann were done intentionally to defraud DeVille. Compensatory damages in the amount of the investment of $390,740.74, as well as $1,000,000 in punitive damages, plus attorneys' fees were sought.

Ross and all of the other defendants except for McCarthy & Associates, were represented by a single Ohio law firm, and made a joint motion to dismiss the complaint for lack of jurisdiction. This motion was denied on June 30, 1983. The delay in ruling on this motion was occasioned by the recalcitrant response of the Ross defendants to discovery and included an order for sanctions from the trial court in April 1983.

On or about July 13, 1983, a single answer was filed on behalf of the defendants other than McCarthy. The answer, which denied the material allegations of the complaint, stated that McCarthy was the accountant for DeVille and acted for and on behalf of DeVille in connection with the complained of transaction and denied that McCarthy had acted as a securities dealer for the defendant Program as alleged in the complaint. It was admitted that the Security was not registered but it was denied that the transaction was in violation of Chapter 1707 of the Ohio Revised Code. No explanation for the denial of violation of Chapter 1707 was given. Various defenses were stated, including that all material information and facts furnished DeVille were true and not misleading in any material respect. The defense of lack of personal jurisdiction was reasserted. In addition, it was averred that the counts in the complaint were barred by the statute of limitations and that DeVille was barred from relief by the doctrine of laches. The answer also asserted a cross-claim against McCarthy which alleged that McCarthy unlawfully sold the Security to DeVille without a dealer or salesman's license in violation of Ohio securities law. It was further stated that when in January 1981 the Program attempted to exempt the Security from registration with the Ohio Division of Securities the exemption was rejected because McCarthy was an unacceptable, unlicensed broker-dealer. It was alleged that, if DeVille recovered against the defendants, the recovery

"will have been brought about and caused by co-defendant's, McCarthy & Associates, Inc.'s violation of Ohio securities law and not by reason of the failure of the cross-claimants to comply with such securities laws."

Thereafter and on August 9, 1983, DeVille moved for summary judgment in his favor. On October 4, 1983, the court rendered its memorandum decision on the motion. The decision stated that Ross and the other defendants had not filed a brief or evidence in opposition to the motion but had merely rested upon the answer filed. The court held that merely resting on the pleadings was not sufficient to create a genuine issue of fact to defeat a summary judgment motion. The decision concluded:

"The Court finds that there is no genuine issue of material fact about which reasonable minds can differ, and that it ap-

pears from the evidence that plaintiff is entitled to judgment as a matter of law. "The Court hereby sustains plaintiff's motion for summary judgment as to Count 1 of its complaint."

The decision states at the bottom "This memorandum will serve as judgment entry." A copy of the October 4, 1983 decision was sent to Jackson, who is a New York attorney not admitted to practice in Ohio, who was by then representing Ross and his entities. It appears that previously and on August 10, 1983, the day after the summary judgment motion was filed, Ohio counsel for the Equidyne defendants had moved to be relieved as counsel, which motion was granted, and the court had fixed September 2, 1983 as the date for securing new counsel. New Ohio counsel was not retained within the time fixed or thereafter until long after the events in issue.

It also appears that on October 14, 1983, the court granted "final judgment as to the ruling made in its judgment entry filed on October 5, 1983" and found "no just cause for delay." Jackson apparently denies having received the October 14, 1983 judgment. The papers before this court do not include the October 14, 1983 judgment nor any reference to the facts surrounding it except for a brief reference in the text of the decision of the Court of Appeals, Stark County, Ohio, Fifth Appellate District referred to below.

The trial court fixed a pre-trial conference on the remaining counts for October 26, 1983. Jackson received notice of the pre-trial conference. He requested the court to grant a continuance because of his unavailability. The continuance was telephonically denied. Neither Jackson nor any of the Equidyne defendants attended the pre-trial conference.

On October 28, 1983, the trial court issued an order dismissing the Equidyne defendants' counterclaim against McCarthy without prejudice because of their failure to appear at the pre-trial conference and fixing a hearing on damages on Counts 2 and 3 for November 2. Apparently, Jack-

son did not receive a copy of the October 28, 1983 order. No hearing appears to have been held on November 2 but a hearing was held on November 16, 1983. On November 21, 1983, the trial court filed its own judgment.

The November 21 judgment states, *inter alia*,

"The Court further finds that Defendants Joel Beeler, Stuart Ross and Robert H. Liebmann were either officers or directors of Equidyne Extractive Industries, Inc., and/or Equidyne Corporation and Defendants Beeler, Ross and Liebmann failed to present any evidence to demonstrate that they had no knowledge of such statements, the lack of truth thereof or that the omission was not material. * * * The Court further finds that each of such Defendants has engaged in willful, wanton and fraudulent conduct in connection with the sale of a security and the operation and performance of the terms of the Limited Partnership Agreement and/or Venture Operating Agreement. * * * The Court further finds that the willful, wanton and fraudulent conduct of each of these Defendants is so outrageous as to warrant the awarding of punitive damages to Plaintiff."

The Court found actual damages of $281,000, consisting of the amounts paid by De-Ville to the defendants, lost interest and opportunities and attorneys' fees to date of $13,000. Punitive damages were fixed at $675,000. The court further dismissed Count Four (the receivership request) of the complaint without prejudice and rendered judgment in favor of the McCarthy (who was the object of Count Five). Although the November 21 judgment makes no explicit reference to the counts of the complaint, it is clear that the court was disposing of Counts 2, 3 and 6 in fixing the two monetary awards and that in the court's view the October 14, 28 and November 21 orders and judgments resolved the totality of DeVille's complaint.

Ross and Jackson have sworn that the first time they learned of the November 21,

1983 judgment was in early June 1984. On or about April 24, 1984, DeVille entered the November 21 judgment in New York County and instructed counsel to begin supplementary proceedings against Ross and the other judgment debtors. Ross failed to appear pursuant to subpoena. DeVille moved for contempt in the supplementary proceedings instituted in the Supreme Court, New York County. Ross cross-moved for a stay of enforcement until proceedings to vacate the Ohio judgment were concluded. On November 16, 1984, the New York Supreme Court declined to cite Ross for contempt and granted the stay conditional upon the filing by Ross of an undertaking pursuant to CPLR 5519(a)(1). Ross did not file an undertaking or obtain a stay of the order.

Previously, in or about July 1984, Ross sought relief from the various judgments in the DeVille Ohio Action from the Ohio trial court. The Ohio trial court denied the motion on December 7, 1984. Ross and the Equidyne Defendants, exclusive of Beeler, who by then was represented by separate counsel, took an appeal from the various judgments in favor of DeVille. The errors assigned related to lack of notice and non-compliance with court rules relative to the entry of the judgments. The Equidyne defendants, exclusive of Beeler and other than Ross, failed to pursue their appeals, which were dismissed for want of prosecution.

All of the events relative to the New York enforcement procedures and the motions to vacate the Ohio judgments took place after the involuntary petition was filed. In filing his joinder in the involuntary petition, DeVille stated that he first learned of the involuntary petition the week of February 5, 1985, or about two weeks before his joinder. The joinder states

"At no time has Ross or his attorney, Stuart Jackson informed petitioner's counsel of these proceedings, and of the stipulation and order of January 6, 1984, despite several opportunities when such disclosure was required in order not to deceive DeVille and his counsel. On several occasions since the commencement of supplementary proceedings in May, 1984, Ross by his attorneys has attempted, unsuccessfully, to settle the petitioner's judgment by the offer of a cash payment."

Ross has not denied that he failed to advise DeVille of the pendency of the involuntary petition.

After the joinder and with the express permission of this court, Ross pursued his Ohio appeal. That resulted in a decision filed on July 8, 1985 by the Court of Appeals, Stark County, Ohio, Fifth Appellate District. In reversing, the Court of Appeals relied on Local Rule 13 for the Stark County Court of Common Pleas that required not less than one month's notice to all counsel by the civil assignment office of the trial date.[16] The Court of Appeals vacated the October 28 and November 19, 1983 judgments, finding that the trial court abused its discretion in overruling the motion to vacate these judgments. The Court of Appeals also held

"We further specifically find that the trial court did not abuse its discretion or

---

**16.** It appears that the trial court had relied upon Local Rule 12.04 in entering the October 28 and November 21 judgments after the defendants' failure to attend the pre-trial conference. Local Rule 12.04 provides

"In the event that neither the defendant nor his counsel appears for such pre-trial conference, the court at plaintiff's request, may hear evidence and decide a case triable to the court, or if it be a case triable to a jury, may accept plaintiff's waiver of trial by jury, hear evidence and decide the case."

At no point in its decision does the Court of Appeals discuss Rule 12.04. It would appear to this court that the Court of Appeals was of the view that at least when the trial does not occur at the time of the pre-trial conference counsel must receive prior notice. Had the trial occurred on October 24, 1983, the date of the scheduled pre-trial conference at which Ross and his counsel, whose appearance had not been excused, failed to appear it would have been difficult for them to complain of lack of notice. However, even if the trial had gone forward on the pre-trial conference date, the Local Rules would apparently have required notice of the entry of judgment.

act contrary to law in granting the summary judgment on Count Number 1. October 5, 1983 and October 14, 1983 judgments."

In finding that the trial court abused its discretion with respect to the October 28 and November 19, 1983 judgments, the Court of Appeals found that Ross had tendered a meritorious defense in his claims that (a) the money paid by DeVille was to corporate entities, not Ross, (b) the failure to drill was diligent, (c) Ross never made any representations of any kind to DeVille, and (d) there was no ill will or malice in any of Ross' relations with DeVille. It is clear that the Court of Appeals has reopened the October 28 and November 21 judgments so that Ross may proceed to trial and judgment, and appeal if the outcome is adverse. It appears that Ross would also be able to appeal the October 5 and 14 judgments at that time. Although this conclusion is uncertain, it is inferred by this court from the stated view of the Court of Appeals that there was no prejudice to Ross in regard to the asserted failure to receive the October 14 judgment. The only basis for a lack of prejudice would be that the grant of the summary judgment motion was not a final judgment.

One final matter should be set out to complete the DeVille/Ross story. On or about December 13, 1984, Ross, Equidyne, Corporation, Coal Venture and Program commenced an action against DeVille, McCarthy and Joseph X. McCarthy ("Joseph") in the Supreme Court of the State of New York, County of New York (the "Ross/DeVille New York Action"). In the Ross/DeVille New York Action, Ross and the other plaintiffs asserted three causes of action. The first cause of action asserted that the plaintiffs had relied on the representations of McCarthy and Joseph that the Security could be claimed as exempt and that McCarthy and Joseph knew the representation to be false when made. It was alleged that McCarthy was acting at the specific instance of DeVille. The first cause of action concluded

"22. As a result of the judgment of recision obtained by DeVille, [McCarthy] Associates and [Joseph] McCarthy have been unjustly enriched in the sum of $39,074 [the amount of the commission paid for the sale to DeVille]."

In the Second Cause of Action, the allegations of the first cause of action are realleged. It then concludes

"24. By reason of the defendants' gross, willful and wanton fraud, plaintiffs have been damaged in a sum to be determined at trial, but in no event less than $430,000, and are entitled to punitive damages of not less than $5,000,000.00."

The Third Cause of Action alleged that DeVille had misrepresented in the various documents executed in connection with the purchase of the Security that his taxable income was subject to Federal income tax at a rate of 49% or higher. It is stated that DeVille's failure to realize the full tax and economic benefits of the Petro/Coal Program resulted solely from DeVille's fraud in investing in a program for which the defendants knew DeVille did not qualify and did not result from any conduct on the part of plaintiffs. It is alleged that DeVille failed to advise the plaintiff of the date of the trial with the result that the default judgment for $965,000 was entered. This count concludes:

"36. As a direct result of defendants' false and fraudulent representations, DeVille was able to enter into an agreement for the purchase and sale of securities with the plaintiffs, commence an action on the basis of that agreement with knowledge that he had obtained plaintiffs' consent thereto by means of fraud, obtain the full tax benefit of that agreement while relieving himself of any obligation to perform pursuant thereto, and avail himself of the fact that plaintiffs all resided in a foreign jurisdiction to obtain a default judgment against them, all to the plaintiffs' damage in a sum to be determined at trial but in no event less than $1,000,000.

"37. By reason of the defendant's gross, willful and wanton fraud, plaintiffs are entitled to punitive damages of not less than $5,000,000."

Ross and his co-plaintiffs moved for summary judgment in their favor in the Ross/DeVille New York Action on or about February 20, 1985. Mr. Jackson submitted an affidavit in support of that motion, which is apparently still pending, in which he stated that he was advised in November 1984 by DeVille's attorney that in 1980 DeVille was only in the 30% tax bracket (although now in the 50% bracket), during a discussion of how the damages reflected in the November 21, 1983 judgment had been calculated. In other words, Ross now complains that he cannot be held liable for defrauding DeVille because DeVille's income was insufficient to allow DeVille to be eligible to be defrauded.

The DeVille judgments are not default judgments in any strict sense of the term. Ross appeared, made a motion based on a lack of jurisdiction, filed an answer and declined to respond to a motion for summary judgment. Indeed, the Court of Appeals stated in passing that "It does appear that this defendant and others took advantage of the judicial process and frustrated the efforts of the court to proceed in an orderly way to the conclusion of litigation." Ross had the opportunity to present his defenses. To the extent that he presented them to the trial court, the trial court found them unpersuasive.

■ At the moment the involuntary was filed, DeVille held what purported to be a final judgment in his favor. After appellate examination, DeVille held only the grant of a motion for summary judgment in his favor. One situation satisfies *In re Drexler,* the other, *In re Stroop.* Either way DeVille's claim was not the subject of a *bona fide* dispute at the time the petition was filed. It is true that at the time the involuntary petition was filed that Ross was, in fact, unaware of the judgments and that subsequently the key ones were vacated. On remand no final decision has yet been reached. However, that small

equity in Ross' favor is negated by the supplementary enforcement proceedings in New York in which Ross failed to file an undertaking and failed to advise DeVille of the pendency of the involuntary petition.

Even were this court to find DeVille was not an eligible petitioner, there would be sufficient petitioners, the court having found that the claims of Merrill, Rosenman, Vogel and Seneca are eligible petitioners.

### Motion for Abstention

■ Ross has requested that this court abstain under Code § 305 because of his offer of security. That offer has not been extended to the claims of the intervening petitioners. The Original Petitioners have rejected it as inadequate. This court finds no warrant in Code § 305 for the imposition of such a "settlement" of an involuntary petition on the petitioners over their objection. Should Ross be able to secure their consent, which may be possible with the elimination of the Robson Firm and WLWFC, the agreement to pay Rosenman and the pending settlement with Merrill, the court would be prepared to reconsider the matter.

### CONCLUSION

Ross' motion to dismiss the involuntary petition for the insufficiency is denied, as is his motion for abstention. Merrill's motion to withdraw as a petitioner is denied. The motions to intervene by Seneca, Vogel and DeVille are granted.

Before an order for relief can be entered, the court must reach and rule on the generally not paying issue. Therefore, a hearing is fixed for September 23, 1986, at 10:00 a.m. for the purpose of a pretrial conference on the open issues and to schedule a trial date.

It is so ordered.