**In re Richard M. TIKIJIAN, Debtor.**

**Bankruptcy No. 84 B 11757 PBA.**

United States Bankruptcy Court,
S.D. New York.

July 23, 1987.

Cole & Deitz, New York City, for Nat. Westminster Bank, U.S.A., Israel Discount Bank of New York, Germantown Savings Bank, and U.S. Trust Co.

Hahn & Hessen, New York City (Jeffrey Schwartz, of counsel), for Lee Talmadge, Trustee of M.J. Williams Corp.

Milbank, Tweed, Hadley & McCloy, New York City, for Chase Manhattan Bank, N.A.

Kaye, Scholer, Fierman, Hays & Handler, New York City (Kenneth S. Goodkind, of counsel), for Albert Togut, Interim Chapter 7 Trustee.

## MEMORANDUM DECISION GRANTING MOTION BY PETITIONERS FOR SUMMARY JUDGMENT AND ORDER FOR RELIEF

PRUDENCE B. ABRAM, Bankruptcy Judge:

For the reasons which follow, this court finds that the petitioning creditors are entitled to entry of an order for relief against the debtor, Richard M. Tikijian ("Tikijian" or "Debtor"), in this involuntary Chapter 7 bankruptcy case. Before discussing the merits of the involuntary petition, it should be stated that Tikijian, the Debtor, died [1] while the motion for summary judgment was *sub judice.*

Tikijian's death did not automatically abate this case. Rule 1016 of the Bankruptcy Rules of Procedure ("Bankruptcy Rules") states:

"Death * * * of the debtor *shall not abate* a liquidation case under Chapter 7 of the Code. In such event the estate *shall be administered* and the case concluded in the same manner, *so far as possible,* as though the death * * * had not occurred." Bankruptcy Rule 1016. (Emphasis added).[2]

Sherman, Citron & Karasik, P.C., New York City (Howard Karasik, of counsel), for John De Sanctis, Executor of Estate of Richard M. Tikijian.

1. Tikijian's apparently unexpected death occurred on or about December 23, 1985.

2. A commentary on the effect of a debtor's demise during the course of a bankruptcy proceeding appears in the legislative history to Bankruptcy Code § 541:

"Consequently, if the debtor dies during the case, only property exempted from property of the estate or acquired by the debtor after the commencement of the case and not included as property of the estate will be available to the representative of the debtor's probate estate. The bankruptcy proceeding will continue *in rem* with respect to any property

This court is thus mandated to continue to administer this case so far as that is possible.

An examination of the procedural posture of this case at the time of Tikijian's death reveals that the Debtor had had the opportunity to respond completely to the petitioners' motion for summary judgment prior to his death. The Debtor swore to several affidavits which were submitted in opposition to the motion. His deposition was taken by the petitioners and the Debtor's counsel deposed the petitioners. As the Debtor was offered full opportunity to be heard on the summary judgment motion before his death, no prejudice to the Debtor could occur by this court proceeding to rule on the summary judgment motion.

## STATEMENT OF FACTS

The involuntary petition against Tikijian (the "Tikijian Involuntary") was filed on December 28, 1984. This date was eighteen days after an involuntary Chapter 11 petition had been filed against M.J. Williams Corp. ("Williams") (the "Williams Involuntary"), Case No. 84 B 11698.[3]

Tikijian was the president and sole shareholder of Williams, a company which he acquired in or about 1980. Williams was a direct lender purportedly engaged in the commercial financing business. Tikijian had been in the business of arranging loan packages in the financial community for almost 20 years at the time he acquired Williams. Tikijian had arranged many different types of loans including leveraged financing for the acquisition of real estate, accounts receivable inventory financing, and international loans. He negotiated the terms of these loans and periodically asked for personal guarantees. In a few instances, Tikijian had sued to enforce personal guarantees. Although he never received a college degree, Tikijian had studied business at the college level and had supplemented his professional education with seminars in economics and business.

The Tikijian Involuntary resulted primarily from Tikijian's involvement with Williams. Two of the original three petitioners in this case, United States Trust Company of New York ("U.S. Trust") and National Westminster Bank USA ("NatWest USA"), were petitioners in the Williams Involuntary. The claim of U.S. Trust and that of the third original petitioner in this case, Germantown Savings Bank ("Germantown"), are based on guarantees by Tikijian of Williams' obligations to the claimants. The claim of NatWest USA is based on a guarantee by Tikijian of an obligation of M.J. Williams Leasing Corp. ("Leasing"), another entity of which Tikijian was an officer and shareholder. Of the four additional entities which subsequently joined as petitioners in the Tikijian Involuntary, two were petitioners in the Williams Involuntary. The Chase Manhattan Bank, N.A. ("Chase") whose claim is based on an alleged guarantee by Tikijian of a Williams debt, joined in January 1985 but withdrew as a petitioner in June 1985. Lee Talmadge ("Talmadge"), the Chapter 11 trustee of Williams, joined on March 1, 1985. Israel Discount Bank ("IDB"), which has a claim based on a guarantee given by Tikijian of Williams' debts, joined on June 17, 1985. (NatWest USA, U.S. Trust, Germantown, Talmadge and IDB are hereafter collectively referred to as "Petitioners").[4] The final petitioner, GNOC t/a Golden Nugget Hotel & Casino ("GNOC"), the

---

of the estate, and the discharge will apply *in personam* to relieve the debtor, and thus his probate representative, of liability from discharge debts."
S.Rep. No. 95–989, 95th Cong. 2d Sess. 83 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5869. See also *In re Crowell,* 53 B.R. 555, 558 (Bankr.M.D.Tenn.1985); *In re Kirschner,* 46 B.R. 583, 584 (Bankr.E.D.N.Y.1985); *In re Tyson,* 48 B.R. 412 (Bankr.C.D.Ill.1985); and *Matter of Danenberg,* 1 B.R. 745, 746 (Bankr.S.D.N.Y.1980).

3. The Williams Involuntary petitioners had been seven banks holding claims aggregating approximately $11.7 million.

4. The Williams petitioners were Chase, NatWest USA, U.S. Trust, IDB, Bank Leumi Trust Company of New York, Irving Trust Company and Bankers Trust Company, the first four of which are also petitioners in this case.

holder of a claim based on a gambling debt, joined on April 15, 1986.[5]

Because of the interrelationship of this case and the Williams Involuntary, it will facilitate an understanding of the issues in this case to discuss the Williams Involuntary briefly. Immediately after the Williams Involuntary was filed, the petitioners sought the appointment of a Chapter 11 trustee for Williams. In the affidavit in support of that request, it was stated that two weeks earlier, from November 28–30, 1984, a representative of one of the petitioning banks examined Williams' books and records and analyzed 24 of the approximately 70 loans made by Williams, a sample totalling $11.6 million, or 73% of Williams' total $15.7 million loan portfolio. A number of serious irregularities were found by the review team, including an entry purporting to reflect a $970,000 loan participation by Williams with a major financial institution which participation that institution refused to acknowledge. The affidavit of the review team representative stated that Williams lacked documentation supporting its lending transactions, that Williams had entered into a very large number of questionable, or non-existent, loan transactions, and that a substantial portion of Williams' business activity appeared to be self-generated. A significant number of questionable and large transfers were stated to have been discovered. It was further stated that Williams lacked all of the essential books and records that would be maintained in the ordinary course of running a legitimate business.

A trial on the motion was held on December 17 and 20, 1984. On the first day, an order for relief was signed with Williams' consent. Tikijian testified at length on both days. During his testimony, Tikijian admitted to gambling at the rate of $500,000 or more a month.

Williams' financial statements were introduced. The one for January 31, 1984 showed total assets of $14,502,948 and a shareholders' equity of $3,328,565. The one for July 31, 1984 showed total assets of $20,262,213, an increase of about $6 million, or approximately 50% in six months, while shareholders' equity remained about the same at $3,478,159. Tikijian explained this dramatic increase in assets at trial as a result of an investment made in Williams in the form of subordinated debt, Williams' acquisitions of equipment made and resold to customers and an increase in loans put on the books. In fact, there was no change in the amount of the subordinated debt reflected on the two statements although an increase had occurred at the end of the prior year. Finance assets in the form of receivables were stated to have gone from $10,353,620 to $15,370,566 in this six-month period with a corresponding increase in liabilities in the form of short-term notes payable. According to the Statement of Earnings there were net earnings from operations for the period of only $149,594.

A representative of the account debtor to whom Williams purportedly made the "participated" loan testified that the company had never borrowed from Williams and owed no such loan to Williams.[6]

Photocopies of several hundred money orders drawn by Williams and payable to Tikijian totalling in excess of $15 million were introduced into evidence. A representative of the New Jersey bank of which they were drawn stated that on or about October 31, 1984, all tellers and floor personnel at the bank had been instructed to place a watch on all deposits and other transactions made by Tikijian because the bank had become concerned about the possibility that it might be or become the victim of a check kiting scheme.[7]

---

**5.** As GNOC's joinder was subsequent to the submission of the present motion and after Tikijian's death, GNOC's status as a petitioner is not at issue on the present motion.

**6.** In his pretrial affidavit in opposition to the motion for the appointment of a trustee for Williams, Tikijian had stated that Williams "par-

ticipated" in the loan in that its loan to its account debtor was made simultaneously with the loan made by the financial institution to that debtor.

**7.** No kiting scheme relative to the issuing bank apparently existed.

Tikijian's explanation at trial for the high volume of money order purchases was that they were necessary to enable him to attend and bid at auctions of printing equipment. However, no evidence was offered to support any actual auction purchases nor were any money orders shown to have been endorsed to any auction house.

The purchase of a money order was reflected as a debit to the account of one of Williams' debtors and its redeposit as a credit. This method of accounting by Williams created the appearance of substantial activity relative to an account debtor, although that activity was unknown to the account debtor.

In granting the motion for the appointment of a trustee for Williams, the court found the kinds of entries Tikijian caused to be made in Williams' books of account to be unwarranted by any generally accepted accounting principle nor necessary to accomplish the purpose for which Tikijian stated that they had been made. The court did not credit Tikijian's explanations as to the reasons for the money orders or their handling and found the transactions to be totally extraordinary.[8] The court found that cause for the appointment of a trustee existed because the transactions were sufficiently unusual to suggest the possibility of fraud and dishonesty and indicated, at a minimum, a form of gross mismanagement. Thereafter, Talmadge was appointed as Chapter 11 Trustee for Williams.

Tikijian filed his answer to the Tikijian Involuntary on January 14, 1985. Thereafter and on January 28, 1985, the Petitioners filed an amended involuntary petition which corrected certain pleading deficiencies.[9] Tikijian filed an answer to the amended petition on January 31, 1985. The answer to the amended petition denied the essential elements of the amended petition, but admitted that Williams and/or Leasing might be indebted to the Petitioners. Four affirmative defenses and one counterclaim were asserted. The first defense alleged a failure to state a claim upon which relief could be granted; the second, lack of proper service, has since been withdrawn; the third stated that the Debtor was generally paying his debts as such debts become due; and the fourth defense stated that the claims of the Petitioners were the subject of a bona fide dispute. The counterclaim alleged that the Debtor suffered damages as a result of an order to show cause entered by the court. In addition, the counterclaim stated:

> "The petitioners acted in bad faith in filing a Petition against the Debtor in that petitioners knew that the Debtor never intended to personally guarantee any of the obligations of M.J. Williams Corp. and/or M.J. Williams Leasing Corp. to petitioners."

Tikijian also demanded a jury trial.

By notice of motion filed February 7, 1985, the Petitioners sought an order granting summary judgment dismissing Tikijian's answer and directing entry of an order for relief. Alternatively, the Petitioners sought an order denying the Debtor's request for a jury trial. Short affidavits from each of the petitioning banks were submitted in support of the motion

---

8. The court stated:

"[T]he typical con artist waves his hands in the air an awful lot and you never know when they are actually making the dip.

"The problem that I have is that I have a case in which there appears to be an incredible amount of hands waving in the air and in which it is not clear whether a dip was being made, but that the hands waving in the air is so unusual and so * * * [peculiar] I have a Debtor who has admitted to gambling at the rate of $500,000 a month.

\* \* \* \* \* \*

"I have a principal of this company who has testified that he's in sole charge of the bank accounts and sole responsibility to be drawing these checks, who has endorsed hundreds of thousands of checks of the Debtor to gambling casinos, who admits he gambles at the rate of $500,000 a month and he does not know whether he wins or loses, who has drawn $15 million worth of money orders over the last year for auction transactions.

"Mr. Karasik [Williams' Attorney]: Your Honor, I'll have to concede that they are extraordinary." Tr., 12/20/84 at 324–5.

9. The original petition failed to allege that the claims of the Petitioners were not the subject of a bona fide dispute. See Code § 303(b). This court has held that such an allegation is essential. See *In re Onyx Telecommunications Corp.*, 60 B.R. 492 (S.D.N.Y.1985).

stating the basis and amount of its claim. Annexed to the affidavits were copies of the guarantees on which the banks' claims are based and of the documents evidencing the primary obligation as well as letters demanding payment from the prime obligor and Tikijian.

Tikijian vigorously opposed the Petitioners' motion for summary judgment. In his March 1, 1985 affidavit in opposition to the motion (the "First March Affidavit"), Tikijian stated that the motion should be denied because of his "firm belief and contention", First March Affidavit at 1, that none of the Petitioners had a valid claim against him and that all of the Petitioners' claims were the subject of bona fide disputes. As to the Germantown and U.S. Trust claims, Tikijian stated that the guarantees had been signed by him as an officer of Williams and that he had never intended personally to guarantee Williams' obligations. He further stated that he believed his attorneys would be able to demonstrate that the banks knew he did not intend to guarantee Williams' obligations. Although Tikijian conceded that NatWest USA held his personal guarantee, he asserted that his guarantee was the subject of a bona fide dispute because of an alleged understanding that Leasing could cause Lithocraft Inc. ("Lithocraft"), a corporation in which he was a 40% shareholder, to be substituted on the primary debt at which time Tikijian's guarantee would be released.

As to the claim of Talmadge, the Williams' trustee, Tikijian denied he was indebted to Williams and stated that Williams was indebted to him, that he was entitled to offset any claim on the bank guarantees and that therefore the Trustee's claim was contingent at best. In a supplemental affidavit in opposition sworn to March 11, 1985 (the "Second March Affidavit") Tikijian stated that his best recollection was that Williams was indebted to him in excess of $1,000,000, apart from the indemnification claims.

Annexed to the Second March Affidavit was a list of 19 creditors that Tikijian stated had claims against him which were not the subject of a bona fide dispute. He further stated that he was generally paying these claims as they fell due and none were past due. Second March Affidavit at 1. Three of the listed creditors' claims are secured by real property. GNOC, one of the intervenors, is listed as owed $250,000. Another Atlantic City casino is listed as owed $500,000. Tikijian's former wife is stated to be owed $162,000. The claims of the other thirteen creditors aggregate just over $56,000.

Following argument, the court took the summary judgment motion under advisement. Thereafter, the court determined that it would be required to deny the summary judgment motion unless it first permitted the Debtor the opportunity to take the discovery of the Petitioners relative to their claims, which discovery had been held in abeyance pending determination of the summary judgment motion.[10] For that reason the court directed the parties to con-

---

**10.** The Petitioners had affirmatively sought by affidavit of their attorney dated February 5, 1985, to stay discovery pending determination of their motion for summary judgment.

This court determined that it would commit reversable error in this case if it granted the summary judgment motion before permitting discovery. In *France v. Beda*, 442 N.Y.S.2d 3, 83 A.D.2d 802 (A.D. 1st Dept.1981) summary judgment in lieu of complaint, a procedure permitted under NYCPLR § 3213 for an instrument for payment of money only, had been granted for the plaintiff on a guarantee. The Appellate Division reversed on the law on the grounds that the purpose of a motion for summary judgment is not to resolve factual issues but to determine whether factual issues exist and that

there were factual issues as to whether the defendants signed the guarantee in an individual or corporate capacity as each of the defendants' signatures on the guarantee had a word or term indicative of a representative capacity and the guarantee had been signed in the presence of plaintiff's representative.

By declining to grant a pre-discovery summary judgment motion, this court recognized that Tikijian was entitled to the opportunity to persuade this court of the merits of his defense on the basis of parol or extrinsic evidence. In addition, Fed.R.Civ.Pro. 56(f), made applicable by Bankruptcy Rule 7056, permits the court to refuse a motion for summary judgment or order a continuance to permit discovery if it has not been had.

duct discovery and supplement the pending motion.

Discovery was thereafter taken by all parties. Tikijian submitted a lengthy affidavit sworn to July 25, 1985 (the "July Affidavit"). Tikijian did not deny that his signature appeared on each of the four guarantees in issue.[11] After describing himself has an experienced member of the financial community, Tikijian urged in his July Affidavit that the discovery demonstrated

a. A custom and practice exists in the financial community that personal guarantees of corporate obligations are not enforced against principals of debtor corporations.

b. With the possible exception of Germantown, none of the petitioning banks (1) conducted a credit survey concerning Tikijian's personal assets or liabilities, (2) had an up-to-date personal financial statement, or (3) had a personal financial statement executed by Tikijian. Tikijian states that "I knew this" and took it "as evidence of the Petitioning Banks' agreement to abide by the aforesaid custom and practice of not enforcing any 'guarantees' which I may have executed." July Affidavit at 9.

c. That, as the various banks knew Tikijian had executed guarantees to almost all of the Williams banks, and that his personal net worth was inextricably tied to Williams' net worth the dilution of his obligation is further evidence that the banks did not rely on the guarantees and had no intention of enforcing them.

Tikijian states that he never had any intention of signing personal guarantees, that the various commitment and transmittal letters produced by the Banks bearing his signature or addressed to him are not personal guarantees and that the "letters were signed in the ordinary course of my office activities without any understanding or intent that the execution of such documents committed me to personal liability." July Affidavit at 17. However, Tikijian does not point to any evidence that would support his pre-discovery assertion that his attorneys would be able to demonstrate that the banks knew he did not intend to guarantee Williams' obligations nor does he assert that he discussed this contention with the banks.

A substantial portion of Tikijian's July Affidavit is devoted to the NatWest claim. Tikijian asserts that it was understood and agreed that Leasing could substitute Lithocraft on the obligation and thereby cause a release of Tikijian's personal guarantee. Tikijian details at length the discussions he had with the representative of NatWest responsible for the transaction.

As to the claim of Talmadge as Trustee of Williams, Tikijian states that the Trustee "admitted" that Williams' books did not reflect an indebtedness to Tikijian on account of indemnification under the guarantees, that Williams' records reflected an indebtedness to Tikijian and that the audit of Tikijian's loan account had not been completed.

Tikijian supports his position with regard to the nonenforcement of personal guarantees executed by principals of corporate debtors with an answer given by Talmadge, who had been employed by several financial companies, at his deposition.[12] In addition to Talmadge's testimony, Tikijian relies on an affidavit from Marc Greenberg, a former Vice-President of Chase, sworn to June 30, 1985 (the "Greenberg Affidavit"). In his affidavit, Greenberg stated that banks and financial institutions

---

**11.** Tikijian does assert that his name and address were typed on the guarantees after execution and that in one instance a notarization was added. These factual disputes are not material in the court's view.

**12.** Talmadge stated:

"In general, personal guarantees are obtained to enforce or to hope to insure the cooperation of the customer in the event there is a financial reversal of the company, and to keep them around so they don't just flop the key on the table and say, 'Here's your company.'

"Rarely, in my experience, have they ever been acted upon. I can only think of one instance in my own personal twenty-five years of business." July Affidavit at 19.

very rarely enforce personal guarantees executed by principals of debtor corporations, with the exception of situations involving fraud or fraudulent conveyances by the principals, if the principals actively and conscientiously promote loan repayments by debtor corporations. Greenberg went on to state that it is regarded as commonly accepted practice (and, often, policy) at most banks to require the personal guarantee of all the principals of a closely-held corporation to which loans are being extended. Greenberg Affidavit at 3, 5 and 6.[13]

Tikijian's July Affidavit states in conclusion that the guarantees were something he calls "officer" guarantees and not "personal" guarantees. Accordingly, he asserts that he never became personally indebted to any of the petitioning banks as a result of the "officer" guarantees.[14]

The Petitioners filed all the depositions taken as well as copies of all the exhibits marked at the depositions. In their memorandum of law, the petitioning banks summarized the various depositions and documents.[15] Talmadge's attorney filed an affidavit stating that on July 16, 1986, he had

attempted to take a deposition of Tikijian pursuant to Bankruptcy Rule 2004 in the Williams case to elicit from Tikijian, among other things, information concerning the debts Tikijian had previously alleged Williams owed to him as well as the facts underlying Tikijian's assertion that he owed Williams nothing. As to all questions put to him at that examination, Tikijian declined to answer and asserted his privilege against self-incrimination under the Fifth Amendment.

The claim of Germantown is based on a guarantee and surety agreement (the "Germantown Guarantee") signed by Tikijian on or about February 10, 1984, which guaranteed payment of a $1.5 million loan made to Williams by Germantown. Tikijian signed a guarantee of the obligations of Williams to U.S. Trust (the "U.S. Trust Guarantee") sometime in 1983 or 1984. IDB's claim is based on a guarantee of payment of the indebtedness of Williams to IDB (the "IDB Guarantee") signed by Tikijian on or about September 15, 1982.

Although the language of each of the three printed form guarantees differs in

---

**13.** Talmadge caused an affidavit to be submitted that states Greenberg was lent in June 1983, at a time of extreme financial need, $15,000 by Williams which was about six months after Greenberg ceased his employment with Chase. In April 1984 Tikijian caused Williams to forgive $2,300 of interest on the loan, enabling Greenberg to pay off the loan in full. The affidavit concludes

"Upon information and belief, the court should grant no credibility to Greenberg's affidavit submitted in this proceeding in light of the admitted debt of gratitude by Greenberg to Tikijian. The mere fact that Greenberg failed to disclose that he was a former Williams account debtor should cast doubt upon the veracity of any of Greenberg's statements." Affidavit of Brian D. Wild sworn to August 2, 1985 at 10.

**14.** Tikijian elaborated on his argument in an additional reply affidavit sworn to August 1, 1985 (the "August Affidavit") in which he states his view that when an intent exists to hold a corporate principal personally liable for a debtor corporation's obligations, personal guarantees are extracted predicated upon a complete credit investigation and up-to-date, fully executed financial statements.

"10. My 'understanding' concerning the effect of the Officer Guarantees which I exe-

cuted was not a secret or an unverbalized limitation of the scope of those Officer Guarantees. Custom and practice, and the open fact that 1 executed Officer Guarantees, and not personal guarantees, fully exonerates me from any liability in connection therewith." August Affidavit at 10.

**15.** Unfortunately they did not supply supporting affidavits and instead merely filed all of the discovery materials. Fed.R.Civ.Pro. 56(e), made applicable by Bankruptcy Rule 7056 states

"Supporting * * * affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits."

As a result of the manner in which the motion for summary judgment was presented, the court was required to sift through a great deal of factual material in order to determine whether there was a factual dispute which would preclude summary judgment.

detail, there is nothing in the body of the three guarantees that would leave any doubt that the agreement was a personal guarantee. For example, the Germantown Guaranty, which is printed in particularly large and easily readable type states

"Guarantor hereby guarantees the punctual performance of all of Borrower's obligations, including, without limitation thereto, payment of money pursuant to the terms of the Loan Documents. The amount of this Guaranty is unlimited. * * * The obligations of Guarantor under this Agreement are primary, absolute, independent, irrevocable and unconditional. * * * Guarantor represents and warrants that * * * Guarantor has the full power, authority and legal right to enter into, execute and deliver this Agreement, * * * this Agreement is a valid and a binding legal obligation of Guarantor, and is fully enforceable against Guarantor in accordance with its terms, * * * [and] Guarantor has a direct financial interest in Borrower and/or Borrower's principals * * *."

Germantown, U.S. Trust and IDB each deny that any corporate title appears after Tikijian's signature on the guarantees held by them. Apparently, these three banks have overlooked that this denial would create a material issue of fact which this court cannot determine on a motion for summary judgment. In fact, this court does not share the opinion of the three banks that Tikijian's assertion that a corporate title appears after his signature on each of the three guarantees is patently false. A close examination of each of the three signatures reveals the existence, or strong possibility of the existence, of a corporate title as part of or after the signature. For the purposes of the summary judgment motion, the court must assume the facts most favorable to Tikijian which means assuming the existence of a corporate title.

There are differences in the details surrounding the negotiation of the IDB, Germantown and U.S. Trust loans and the execution of the documentation. However, in each case the bank requested a personal guaranty as part of its standard practice, would not have made an unsecured loan to Williams without the guarantee and believed that it had obtained Tikijian's personal guarantee. Tikijian worked together with Charles Greenhalgh, a Williams' employee since mid–1983 and a former bank loan officer, to procure the loans for Williams. Tikijian conducted annual luncheons for the Williams' bank lenders to advise the banks what had transpired during the year, to discuss near term expectations and long range plans, and to allow the bankers to meet with one another at the same time. Obtaining bank loans was a regular part of Williams' business.

Tikijian stated at his deposition that he did not like reading documents and frequently signed documents presented to him without reading them. The guarantees to the three banks are among the documents Tikijian asserts he signed without reading.[16]

There were letters between Germantown and U.S. Trust, the banks and Williams, signed by either Greenhalgh or Tikijian which outlined the terms of the bank's commitment. These letters plainly refer to a requirement that Tikijian deliver a personal guarantee. Tikijian delivered personal financial statements to all three banks.

## DISCUSSION

### The Jury Trial Demand

■ The Debtor is of the view that Bankruptcy Code § 303(h) *requires* that a trial be held, and that the issues raised by his answer may not, as a matter of principle, be determined by a summary judgment motion. Code § 303(h) provides in pertinent part:

"If the petition is not timely controverted, the court shall order relief against the debtor * * * Otherwise, *after trial,* the court shall order relief against the

---

**16.** It can be questioned how Tikijian determined he should so carefully and inconspicuously add a title after his signature on each of the guaran-

tees if he did not read them or know what he was signing.

debtor in an involuntary case * * * only if—

"(1) the debtor is generally not paying such debtor's debts as such become due unless debts * * * are the subject of a bona fide dispute * * * " (Emphasis added).

The Debtor asserts that by inserting the words "after trial" Congress intended that the court is required to hold a trial prior to entry of an order for relief if an answer has been filed by a debtor controverting the petition. The Debtor argues therefore that any Bankruptcy Rule permitting a motion for summary judgment is inapplicable because in direct conflict with the explicit language of the Bankruptcy Code. See 28 U.S.C. § 2075 ("The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11. Such rules shall not abridge, enlarge, or modify any substantive right.").

This court finds the Debtor's argument to be without merit. The present Bankruptcy Rules were adopted in 1983 with Congressional approval some five years after the Code became effective. Under the former Bankruptcy Act, arguments identical to those made by Tikijian had been made and universally rejected. See, e.g., *In re Georgia Jewelers, Inc.*, 219 F.Supp. 386 (N.D.Ga.1962); and *In re Naftalin & Co.*, 315 F.Supp. 463 (D.C.Minn.1970).

Summary judgment is a procedural device well established in the federal system. Bankruptcy Rule 1018 specifically directs that Bankruptcy Rule 7056 applies to contested involuntary petitions. Fed.R.Civ. Pro. 56, the federal summary judgment rule, is incorporated by reference in Bankruptcy Rule 7056.

The reasons for rejecting Tikijian's argument have been well set out by the court in *In re Georgia Jewelers, Inc.,* 219 F.Supp. 386 (N.D.Ga.1962):

"The bankrupt in fact contends that its right to a jury trial is 'absolute', and that a granting of summary judgment is error even where no material issue of fact exists. Obviously the right to a jury

trial on certain issues exists only when there are actual issues to be tried. If, on a motion for summary judgment, it is determined that there is no material issue of fact, then only questions of law remain and trial by jury is not only unnecessary, it would be an invasion of the province of the Judge who is the sole arbiter of matters of law." 219 F.Supp. at 399.

See also *In re Chong*, 16 B.R. 1 (Bankr.D. Hawaii 1980); *In re McEvoy*, 37 B.R. 197 (Bankr.E.D.Va.1984).

This court finds no reason to hold that Bankruptcy Rule 1018 invalid to the extent that it permits the issues raised to be tested by a motion for summary judgment, particularly when it is recognized that the granting of a jury trial on an involuntary petition is by statute discretionary with the bankruptcy court. See 28 U.S.C. § 1411(b). See also *In re Drexler*, 39 B.R. 18 (Bankr. S.D.N.Y.1984). Tikijian's argument that a trial on a contested involuntary petition is mandatory is therefore rejected.

*Bona Fide Dispute*

■ Code § 303(b)(1) provides that an involuntary bankruptcy proceeding may be commenced by the filing of a petition

"by three or more entities, each of which is * * * a holder of a claim * * * that is not contingent as to liability or the subject [of] a bona fide dispute * * *, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims * * * "

Code § 303(h)(1) directs the court to enter an order for relief only if the debtor is generally not paying its debts as they become due except for those debts that are the subject of a bona fide dispute.

The bona fide dispute language was added by the Bankruptcy Amendment and Federal Judgeship Act of 1984 ("BAFJA"). The term "bona fide dispute" is not defined in the Code. See *In re Drexler*, 56 B.R. 960, 965–66 (Bankr.S.D.N.Y.1986) ("*Drexler* "); and *In re Ross*, 63 B.R. 951 (Bankr. S.D.N.Y.1986) ("*Ross* "). It was stated by the proponent of the amendment to Code § 303 that the primary purpose of the addi-

tion of the bona fide dispute language was to prevent creditors from using involuntary bankruptcy as a club to coerce a debtor to pay debts as to which the debtor, in good faith, had legitimate defenses. *See* S. 7618, 98th Cong. 2d Sess., June 19, 1984.

Tikijian's view is that his bona fides in disputing the Petitioners' claims is of paramount concern, regardless of whether the Petitioners' claims are in fact well-founded. This court has previously rejected the proposition that a debtor's subjective intent is a significant consideration in the determination of whether a claim is the subject of a bona fide dispute.

> "[T]he debtor's sincerity or lack of it is not at issue since the debtor's pure heart would not allow him to prevail on the pre-petition litigation if his position were without objective legal or factual merit nor would the debtor's ill will or spite in standing on a legal technicality generally preclude the debtor from prevailing in that litigation."

*Ross*, 63 B.R. at 961. Accord, *In re Lough*, 57 B.R. 993, 996–97 (Bankr.E.D.Mich.1986) ("[T]he *Johnston Hawks* test would disqualify a creditor when a debtor has a defense which he or she offers in subjective good faith but which, objectively has little or no merit. The Court simply cannot conclude that Congress intended to invoke any such considerations in the language 'bona fide dispute'.")

Instead in *Ross* this court found that although

> "the phrase 'bona fide dispute' can be defined as 'honest conflict' or 'good faith controversy' " 63 B.R. 960

that this definition by itself was too general to be of much assistance in resolving actual cases. This court found that when the petitioners' claims were the subject of pre-petition litigation, the bankruptcy court should review the pre-petition litigation

> "to determine * * * whether the debtor's legal position in that litigation has any genuine and objectively determinable legal merits." 63 B.R. 960.

Here only two of the petitioners' claims appear to have been the subject of pre-petition litigation directly between Tikijian and the petitioner and that litigation was in its infancy. In at least some relevant senses, Tikijian was engaged in pre-petition litigation with most of the petitioners by virtue of the Williams bankruptcy case.

Because of the sparse pre-petition litigation and the difficulty of conducting a trial after the death of the debtor, it is tempting to turn to the summary judgment test used in *In re Stroop*, 51 B.R. 210 (D.Colo.1985). In *Stroop*, the court stated that "an appropriate standard in determining whether a claim is subject to a bona fide dispute * * * is that applicable on motions for summary judgment." The court held that

> "If the defense of the alleged debtor to the claim of the petitioning creditor raises material issues of fact or law so that a summary judgment could not be rendered as a matter of law in favor of the creditor on a trial of the claim, the claim is subject to a bona fide dispute." 51 B.R. at 22.

Since the *Stroop* court found that it could not grant summary judgment for the petitioning creditor on its claim, the court dismissed the involuntary petition.

The Second Circuit stated prior to the 1984 amendment in *In re B.D. International Discount Corp.*, 701 F.2d 1071, 1077 (1983) that

> "In order to qualify a claim as a basis for seeking involuntary bankruptcy a claimant need not make out a case warranting summary judgment * * *. It is sufficient to establish, as Chase did here, that there are good grounds for the claim and that no defenses have been asserted in substantiable form. Whether less may suffice we need not decide."

This court has previously indicated that the *Stroop* test maybe too strict. See *Ross*, 63 B.R. at 691. The court in *In re Lough*, *supra*, rejected the *Stroop* test for the following reasons:

> "The difficulty is that the test does not fully address a case where there is a substantial dispute as to the proper application of law but no substantial issue of fact. * * *

" * * * The legislative history makes clear that Congress intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt whether that basis is factual or legal. Congress plainly did not intend to require a debtor to pay a legitimately disputed debt simply to avoid the stigma of bankruptcy. Accordingly, if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed.

"In this regard, the court must emphasize that in deciding whether there is a bona fide dispute, it must not resolve any genuine issues of fact or law." 57 B.R. 997.

In the final analysis, it must be concluded that the issues raised on a motion for summary judgment are not coextensive with the question of whether a claim is the subject of a bona fide dispute. A court can decide close, or even novel, questions of law on a summary judgment motion as long as there is no dispute as to a material fact. Conversely, a court cannot decide a summary judgment motion on well-settled principles of law if there is a dispute as to a material fact. Rule 56 divides disputes by whether they involve material facts or not. This is not the dividing line established by the *bona fide* dispute language of Code § 303.

Indeed, in a number of ways, Bankruptcy Rule 9011, which is based on Fed.R.Civ. Pro. 11, is philosophically more related to the involuntary petition *bona fide* dispute inquiry. Rule 9011 states that a signature on a pleading is a certificate that the pleading to the best of the signer's

"knowledge, information, and belief formed after reasonable inquiry * * * is well grounded in fact and is warranted by existing law or a good faith argument

for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

Certainly a pleading which cannot pass muster under Rule 9011 cannot raise a bona fide dispute. How much more is required is susceptible of analysis only on a case by case basis.

This court opts to apply to this case the standard it enunciated in *Ross.* Thus, the objective of this court's review, which necessarily encompasses consideration of Tikijian's factual points as well a his legal ones, on the various Petitioners' claims is to determine whether his position as to each Petitioners' claim has any genuine and objectively determinable legal merit.

### THE PETITIONERS' CLAIMS

*Germantown, U.S. Trust and IDB*

Tikijian has raised an identical two-fold attack on the claims of Germantown, U.S. Trust and IDB, each of whose claims are predicated on guarantees of Williams' debt signed by Tikijian.[17] First, Tikijian asserts that the guarantees are something he calls "officer guarantees" and are not, despite their language, intended to impose any personal monetary obligation on Tikijian. In the second prong of his attack, Tikijian urges that the addition of a corporate title after his name eliminates any personal liability on the guarantees. Although these two issues are complementary, they are independent theories. For the reasons which follow, this court finds that while Tikijian's objections to these three claims have novelty that they do not have any genuine or objectively determinable legal or factual merit. Thus, each of these three

17. Although Germantown's claim is governed by Pennsylvania law and the claims of U.S. Trust and IDB are governed by New York law, the three claims may be most conveniently dealt with together as they are factually similar and the applicable law in the two states leads to the same result. Although as it happens this court finds that the law of the two states is, so far as relevant to this case, the same, that happy coincidence does not lessen the need to be alert to the questions of the proper governing law, even when, as here, the parties ignore the issue. In New York, the courts are required to take judicial notice without request of the common law and statutes of every state. See NYCPLR Rule 4511.

creditors hold claims which are not the subject of a bona fide dispute.

■ Tikijian's arguments fail for reasons rooted in contract law. "The existence of a binding contract is not dependent on the subjective intent" of the parties. *Brown Brothers Electrical Contractors, Inc. v. Beam Construction Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 361 N.E.2d 999 (1977); *Mencher v. Weiss*, 306 N.Y. 1, 7, 114 N.E.2d 177 (1953); *Hotchkiss v. National City Bank*, 200 F. 287, 293 (1911) *aff'd sub. nom National City Bank v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). Rather, the court must look to the "objective manifestations of the intent of the parties as gathered by their express words or deeds." *Brown Brothers*, 41 N.Y.2d at 399, 393 N.Y.S.2d 350, 361 N.E.2d 999. See also *Porter v. Commercial Casualty Ins. Co.*, 292 N.Y. 176, 183, 54 N.E.2d 353 (1944) ("What is in the mind of the parties to a contract is evidenced by word or deed and must be determined therefrom."); *Steuert v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982) ("[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended.") (emphasis in original).

In reviewing the terms of the guarantees this court cannot take into account Tikijian's subjective beliefs which were uncommunicated to the banks. Thus, whatever Tikijian's subjective understanding was of the banks' practices in enforcing the personal liability of corporate principals under guarantees or of the legal effect of his addition of a corporate title to the guarantees, it has no consequence "unless it took form in some acts or words, which, being reasonably interpreted, would have such meaning to ordinary men * * * Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and no characterization of its effect by either party thereafter, however truthful, is material." *Hotchkiss*, 200 F. at 293–94. No mat-

ter how truthful Tikijian's various statements in his affidavits in opposition to the summary judgment motion about his intentions and understandings at the time the guarantees were signed may be, these statements are irrelevant to the resolution of the motion as Tikijian has failed to proffer any evidence indicating that the banks shared his understandings or knew that he did not intend to become personally obligated on the guarantees. This court must base its interpretation of the guarantee agreements on the manifested promises which the parties would be reasonably justified in understanding to be included in the agreements. See 4 Williston Contracts § 610B (3d ed. 1961). The goal of the interpretation of these agreements is thus the "realization of [the parties] reasonable expectations." See *Brown Brothers*, 41 N.Y.2d at 400, 393 N.Y.S.2d 350, 361 N.E.2d 999 quoting 1 Corbin, Contracts § 1 (1963).

In attempting to resolve what the parties in this case would reasonably expect from their agreements, separate consideration must be given to both the form of Tikijian's signatures on the guarantees and to the alleged custom and practice of banking institutions not to enforce personal guarantees. As to the first issue, this court has analyzed the signatures in light of the totality of the circumstances surrounding the signing of these guarantees, and concluded that the titles are simply *descriptio personea*.[18] The court agrees that parol evidence may be offered. "[I]t is generally held that * * * parol evidence is admissible to explain the latent ambiguity [of a signature]" and to "show whether a guaranty of a corporation's liability was signed in an officer's representative or individual capacity." 70 ALR 3d 1276, 1283 § 3 (1976). The mere fact that this court has to initially categorize Tikijian's signatures as either "representative" or "individual" admits to their latent ambiguity.

"The determination of the question as to who is bound as a guarantor involves consideration of the entire writing and

---

**18.** Nothing turns on the illegibility of the titles on the three guarantees and, for the purposes of this decision, it is assumed that in each case the title was apparent to the banks.

not just the form of the signature to the writing. Thus, the mere fact that the defendant signed the guaranty in a form which appears to obligate only a business entity of which the defendant is an officer does not exclude personal liability of the defendant if the body of the writing indicates that the defendant was personally guaranteeing the principal obligation."

38 Am.Jur.2d (Guaranty) § 27 at 1026.

The only parol evidence that Tikijian proffers is his subjective intention that he did not intend to be bound and of what he believed to be the legal significance of the form of his signatures: that the addition of a corporate title absolved him of all personal liability. This offer of Tikijian's subjective intent as evidence is legally insufficient as only those intentions overtly manifested by the parties to the guarantees, whether offered through parol or in the writing itself, could be used to interpret the agreements. The language of the guarantees is express and clear and states affirmatively that Tikijian—as guarantor—will guarantee all of the obligations of the borrower, Williams. He knew or ought to have known what the banks intended by the guarantee agreements because that was evidenced in the words of the contracts themselves as well as in the negotiations and commitments leading to the loans to Williams. Thus, even with the admission of parol evidence, there still results no triable issue of fact on which to predicate a denial of the motion for summary judgment. See *Casco National Bank v. Clark*, 139 N.Y. 307, 311, 34 N.E. 908 (1893) ("Unless the language creates, or fairly implies, the undertaking of the corporation, if the purpose is equivocal, the obligation is that of its apparent makers.") [19] *See also Ricker v. B–W Acceptance Corp.*, 349 F.2d 892 (10th Cir.1965) (The addition of "Pres" after the individual's signature did not render the otherwise clear instrument ambiguous and served only as a *descriptio personea* ); *Germantown Trust Co. v. Ernhardt*, 321 Pa. 561, 184 A. 457 (1936); and *Elkay Manufacturing Co. v. Chesco Supply Co.*, 219 Pa.Sup. 530, 281 A.2d 765 (1971).

■ Tikijian's second argument is that even if the contract was a personal guarantee, it was the custom and practice of banking institutions not to enforce personal guarantees against corporate principals. "[S]ome of the surrounding circumstances always must be known before the meaning of the words can be plain and clear; and proof of the circumstances may make a meaning plain and clear when in the absence of such proof some other meaning may also have seemed plain and clear." 3 Corbin, Contracts § 542 (1960). Thus, this court must look at the custom and usage evidence proffered by Tikijian before it can determine whether it bears on the interpretation of the guarantees.

"Indeed, whether the language of an agreement is clear and unambiguous may not be apparent without cognizance of the context in which the agreement arose. The flexibility of or multiplicity in the meaning of words is the principal source of difficulty in the interpretation of language. Words are the conduits by which thoughts are communicated, yet scarcely any of them have such a fixed and single meaning that they are incapable of denoting more than one thought.

---

**19.** The Debtor seeks to distinguish the *Casco* case by the fact that it involved promissory notes. However, that argument fails as the application of the *descriptio personea* rule to a guarantee is even more logical and appropriate since a guarantee by definition is a promise by one person to fulfill the obligations of another party. *See Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 359–60, 390 N.Y.S.2d 622 (2d Dept. 1977); *see also* 38 C.J.S. (Guaranty) § 1 at 1129 (1943), 38 Am.Jur.2d (Guaranty) § 1 at 996 (1968).

"Ordinarily the mere fact that a person adds to his signature a word such as 'agent,' 'manager,' 'treasurer,' or the like, without stating that he is contracting on behalf of another, is not regarded as preventing a personal obligation from attaching to the signer; such words are deemed not to change the character or capacity of the person signing, but to be merely descriptive of him, or, to use the legal term, *descriptio personea*."

2 N.Y.Jur.2d (Agency) § 183, p. 604 (footnote and citations omitted). *See also:* Restatement of Agency 2d § 156, pp. 372 et seq. Accord *Williston on Contracts*, 3d Edition, § 299, pp. 393–394.

In addition to the multiplicity in meaning of words set forth in the dictionaries there are the meanings imparted to them by trade customs, local uses, dialects, telegraphic codes, etc. One meaning crowds a word full of significance, while another almost empties the utterance of any import." *Steuert*, 444 A.2d at 662 (quoting) *Hurst v. Lake & Co., Inc.*, 141 Or. 306, 310, 16 P.2d 627, 629 (1932), quoted in 4 Williston, Contracts § 609 (3d ed. 1961).

The extrinsic evidence in the instant case, however, shows no such multiplicity of meanings in the language of the guarantees as to create a triable issue of fact. There are no "patent" ambiguities appearing in the agreements. "A patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language use." *Id.* (quoting Black's Law Dictionary 105 (Rev. 4th ed. 1968)). The language of each of the guarantees is unequivocal and clearly evinces an intent to personally bind Tikijian. Nor are there "latent" ambiguities in the meaning of the words used in the guarantees. "[A] latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Id.* (citing *Easton v. Washington County Ins. Co.*, 391 Pa. 28, 137 A.2d 332 (1957)). See also *Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F.Supp. 116 (S.D.N.Y.1960) (Finding the word "chicken" in a contract ambiguous, the court looked to determine whether it had any meaning in trade usage and found none.)

Tikijian has not proffered evidence that all banks do not enforce personal guarantees against corporate principals. Indeed, all Tikijian has shown is that banking institutions definitely will take action to enforce a personal guarantee in the event of fraud. This court takes note that there is extensive case law in which banks have successfully enforced personal guarantees against corporate principals. See, e.g., *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y. S.2d 309, 485 N.E.2d 974 (1985); and *Bra-*

*ten v. Bankers Trust Co.*, 60 N.Y.2d 155, 468 N.Y.S.2d 861, 456 N.E.2d 802 (1983). The fact then that some banks, in some instances might not enforce such guarantees has no bearing on the parties reasonable expectations as to the legal enforceability of the guarantees, based on those manifest intentions, upon entering into the agreements in the instant case. Thus, the parol evidence offered by Tikijian to prove the existence of an ambiguity in the guarantees with respect to the custom and practice of banking institutions is legally insufficient to rise to a level of a triable issue of fact.

Surely the express language of the guarantees provides for a comprehensible obligation on the part of the signor for the borrower's debts such that Tikijian knew or, by an objective standard, reasonably should have known, that he would be held personally liable on the Williams' loans. Similarly, from the words of the agreements, IDB, U.S. Trust and Germantown would be reasonably justified in relying on the guarantees as providing a promise by Tikijian to personally guarantee the loans in the event of default by Williams. To find otherwise on the basis of some hidden intent Tikijian alleges he harbored would deny the lenders the ability to enforce a contract which they had every reason to expect to be enforceable.

The parol evidence rule is a rule of substantive law, not merely one of evidence. It precludes a party to a contract from attempting to vary the express terms of the contract through the use of extrinsic evidence.

"The applicability and effect of the parol evidence rule is properly considered in the context of a motion for summary judgment. * * * There is no logical reason for forcing the parties to go to trial when there could be no genuine issue as to a material fact, regardless of the reasons for the lack of such issues. Of course, if there are factual issues bearing on the applicability of the parol evidence rule or other genuine issues as to

material facts, then the case ought properly proceed to trial.

\* \* \* \* \* \*

"Briefly stated, the parol evidence rule seeks to preserve the integrity of written agreements by refusing to permit the contracting parties to attempt to alter the import of their contract through the use of contemporaneous oral declarations."

*Rose v. Food Fair Stores, Inc.*, 437 Pa. 117, 262 A.2d 851, 853 (1970). See also *Bardwell v. Willis Co.*, 375 Pa. 503, 100 A.2d 102, 104 (1953) ("Where the alleged prior or contemporaneous oral representations or agreements concern a subject which is specifically dealt with in the written contract, and the written contract covers or purports to cover the entire agreement of the parties, the law is now clearly and well settled that in the absence of fraud, accident or mistake the alleged oral representations or agreements are merged in or superseded by the subsequent written contract, and parol evidence to vary, modify or supersede the written contract is inadmissible in evidence."); *Bokser v. Lewis*, 383 Pa. 507, 119 A.2d 67, 69 (1956); and *Hamilton Bank v. Rulnick*, 327 Pa.Super. 133, 475 A.2d 134 (1984).

The New York courts have been extremely unreceptive to attempts by guarantors to use parol evidence to avoid liability. See, e.g., *Braten v. Bankers Trust Co.*, 468 N.Y.S.2d 861, 60 N.Y.2d 155, 456 N.E.2d 802 (1983). In *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), the New York Court of Appeals upheld the grant of summary judgment to the plaintiff banks on guarantees given by corporate officers and directors in connection with a line of credit to the corporation.

"Fraud in the inducement of a guarantee by corporate officers of the corporation's indebtedness is not a defense to an action on the guarantee when the guarantee recites that it is absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee, or any other circumstance which might otherwise constitute a defense available to a guarantor in respect of the guarantee, those recitals being inconsistent with the guarantors' claim of reliance upon a oral representation that the lending banks were committed to extend to the corporation an additional line of credit.

\* \* \* \* \* \*

"Though not the explicit disclaimer present in *Danann [Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597], the substance of defendants' guarantee forecloses their reliance on the claim that they were fraudulently induced to sign the guarantee by the banks' oral promise of an additional line of credit. To permit that would in effect condone defendants' own fraud in 'deliberately misrepresenting [their] true intention" (*Danann Realty Corp. v. Harris*, 5 N.Y.2d at 323 [184 N.Y.S.2d 599, 157 N.E.2d 597]) when putting their signatures to their 'absolute and unconditional' guarantee." 66 N.Y.2d at 92, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974.

The misrepresentation of intention condemned by the New York Court of Appeals in *Citibank v. Plapinger* appears almost formalistic compared to the deliberately constructed misrepresentations of intention which appear to have been made by Tikijian.

Although no doubt a contract could be drafted under which a corporate officer would obligate himself to use his best efforts to assist the lenders but without assuming any liability for the debt, these three guarantees are not such contracts. That a bank may choose to relinquish its right to sue under a personal guarantee in a particular case reflects no more than a business judgment by the bank that there would be little practical point in pursuing a guarantor with no significant assets.

*NatWest*

■ On or about June 22, 1984, Leasing borrowed $500,000 from NatWest and executed a demand promissory note (the "NatWest Note"). Leasing also granted NatWest a security interest in a piece of printing equipment as collateral for the NatWest Note. By an instrument dated June 22, 1984, Tikijian executed a guaranty of

payment (the "NatWest Guaranty") of the NatWest Note. The Debtor concedes that he signed his guaranty in his personal capacity.

By letters dated December 5, 1984, NatWest made demand upon Leasing for payment of the NatWest Note and upon the Debtor for payment under the NatWest Guaranty. No payment of the NatWest Note was made by Leasing or by Tikijian and it remained unpaid at the time the involuntary petition was filed.

As indicated earlier, Tikijian devotes a substantial portion of his July 25, 1985 Affidavit (the "Second Affidavit") to the NatWest claim. It appears to be agreed that the NatWest Note was originally conceived as a form of bridge financing pending Lithograph's obtaining certain government loans. Tikijian also asserts, without much contradiction, that the NatWest loan officer told him that the NatWest Guaranty would not be enforced until Leasing had defaulted and the collateral proved insufficient.

In or about November 1984, Tikijian requested that NatWest take over the Lithograph loan and remove Leasing from the transaction. NatWest declined to alter the existing documentation.

The Debtor has failed to raise a genuine issue of material fact as to enforceability of the NatWest Guaranty. The NatWest Guaranty and Note are complete and unambiguous documents.

The Guaranty provides that:

"It is agreed that all understandings and agreements heretofore had between the parties herto are merged in this Guarantee which alone, fully and completely, expresses their understanding." NatWest Guaranty at 2.

The Debtor's averments that there existed an oral understanding that would in effect negate his liability on the Guaranty clearly conflicts with and is inconsistent with the unqualified form of the Guaranty. Thus, this parol evidence is inadmissible. See discussion, *supra*.

Tikijian also asserts that payments on the NatWest Note are being made by Li-thograph into an escrow account. Inasmuch as the NatWest Guaranty is a guaranty of payment, not collection, NatWest has made a sufficient showing through proof that demand for payment was made on Tikijian by letter dated December 5, 1984. Concededly, no payment was made by Tikijian, nor was payment made by Leasing on whom demand was also made.

The court finds that the Debtor's defenses to the NatWest claim are legally insufficient. Thus, the claim of NatWest is not the subject of a bona fide dispute and NatWest is an eligible petitioner.

*The Williams Trustee*

Thus far, the court has found four eligible petitioners. Only three are required. The state of the factual submissions renders it impossible for this court to determine whether there is a bona fide dispute as to the claim of the Williams Trustee and he may not be counted among the eligible petitioners. At his deposition, Talmadge indicated that he was not familiar with the Williams records. It is unclear whether the claim he asserts is a claim actually shown on Williams' books at the date the Chapter 11 petition was filed. The amount of and basis for the claim are unclear.

This court does reject the contention of Tikijian that he would be entitled to offset indemnity claims for liability on the guarantees against any amount he owed Williams. Code § 553(a) permits a creditor to offset

"a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

"(1) the claim of such creditor against the debtor is disallowed other than under section 502(B)(3) of this title * * *"

By virtue of the operation of Code §§ 509 and 502(e)(1), a guarantor of an obligation of a debtor does not have a claim that will share in the estate unless and until the prime obligation has been paid in full. 3 *Collier on Bankruptcy* (15th Ed. 1986),

502.09. The claims of co-debtors are prevented thereby from competing for the limited proceeds in the estate.

### Generally Not Paying

■ Having found a sufficient number of eligible petitioners, the court must determine whether the Debtor is generally not paying his debts as they become due, except for those debts that are the subject of a bona fide dispute. Code § 303(h). This analysis must necessarily be made as of the date the petition was filed. *See Matter of Bishop, Baldwin, Dillingham & Wong, Inc.*, 779 F.2d 471 (9th Cir.1985).

The Debtor, of course, asserts that he is generally paying his debts as they become due. In this analysis he excludes the claims of the Petitioners. The Debtor has provided the court with a list of his 19 "known creditors" whose claims he asserts are not the subject of a bona fide dispute. The total of those claims is less than $1.4 million. However, the court has already determined that the NatWest, Germantown, U.S. Trust and IDB claims are not the subject of a bona fide dispute. Accordingly, they must be included in the "generally paying" analysis. The aggregate sum of these claims is over $5.4 million. Therefore, of an aggregate outstanding debt of approximately $6.8 million, $5.4 million has not been paid as it became due. Thus the portion of the Debtor's debts that were not the subject of a bona fide dispute and he was not paying as they became due is roughly 80%. This is a great deal more than a mere showing of a few minor unpaid debts. *Cf. In re Central Hobran Associates*, 41 B.R. 444 (D.Hawaii 1984); *Matter of Cinnamon Lake Corporation*, 48 B.R. 70 (Bankr.Fla.1985). Although the number of creditors must be considered as well as the amount of claims, a finding that a greater number of creditors are being paid than not is insufficient to defeat the petition when the overwhelming amount of claims is not being paid.

### Summary Judgment

In order for this court to determine that the Petitioners are entitled to summary judgment, the court must find at least three petitioners whose claims are not the subject of a bona fide dispute. The court must find that the generally not paying requirement of Code § 303(h)(1) has been met. This court has made both of these findings.

In ruling on a motion for summary judgment, a court must resolve all disputes in favor of the non-moving party. *In the Matter of Iota Industries*, 35 B.R. 693, 695 (Bankr.S.D.N.Y.1983). The court may grant summary judgment only if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *In the Matter of Iota Industries*, 35 B.R. at 695; *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980); *Federal Rules of Civil Procedure*, 56(c).

A fact is material in the summary judgment analysis only if it "affects the outcome of the litigation". *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. den.* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754. A material issue is "genuinely in dispute" if

"[it is] established by 'sufficient evidence supporting the claimed factual dispute * * * to require a jury or judge to resolve the parties differing versions at trial'."

*Hahn v. Sargent*, 523 F.2d at 464 (citation omitted). A party may not oppose a motion for summary judgment by relying "on the gossamer threads of whimsey, speculation and conjecture." *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir.1962).

The mere existence of factual disputes does not allow Tikijian to defeat the summary judgment motion if the disputed facts are not material or their resolution in Tikijian's favor would still not enable him to prevail. This court cannot deny the motion for summary judgment merely because Tikijian has proffered some parol evidence bearing on the claims of the various petitioners. The United States Supreme Court has recently stated that it is

"convinced that *the inquiry* involved in a ruling on a motion for summary judgment or for a directed verdict *necessar-*

*ily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.* If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

*Anderson v. Liberty Lobby, Inc., et al.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986) (Emphasis added). None of the disputed facts, even if found in Tikijian's favor would warrant a finding that the involuntary petition should be dismissed for lack of qualified petitioners or because Tikijian was generally paying his debts.

### CONCLUSION

This court holds that the claims of Germantown, U.S. Trust, IDB and NatWest are not the subject of a bona fide dispute. The court further holds that the generally not paying requirement has been met. Therefore, an order for relief should be entered as the court finds that there are no genuine issues of material fact for trial and the Petitioners are entitled to judgment as a matter of law.

Concurrently herewith the court has signed an order for relief against the Debtor.